**Case No. 22-2929**

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

**Michael Ortega**
Petitioner-Appellant
v.
**Ryan Woods**
Respondent-Appellee

Oral Argument Requested

On Appeal from the United States District Court
For the Northern District of Illinois
1:18-cv-03631
*The Honorable John F. Kness, Judge*

Opening Brief of Appellant

Jeffrey E. Stone (IL #6189590)
Daniel R. Campbell (IL #6312473)
Samuel M. Barder (IL #6345365)
444 West Lake Street, Ste. 4000
Chicago, Illinois 60606
Telephone: 312-984-2064
jstone@mcdermottlaw.com
dcampbell@mcdermottlaw.com
sbarder@mcdermottlaw.com

*Attorneys for Petitioner-Appellant*
*Michael Ortega*

Save As Clear Form



**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2929

Short Caption: Ortega v. Wills

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Micheal Ortega

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

McDermott Will & Emery LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Jeffrey E. Stone Date: 11/15/2022

Attorney's Printed Name: Jeffrey E. Stone

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 444 W. Lake St., Suite 4000

Chicago, IL 60606

Phone Number: 312-984-2064 Fax Number: 312-277-2385

E-Mail Address: jstone@mwe.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2929

Short Caption: Ortega v. Woods

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Michael Ortega

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

McDermott Will & Schulte LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/Daniel R. Campbell Date: 4/20/26

Attorney's Printed Name: Daniel R. Campbell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 444 W. Lake Street, Suite 4000

Chicago, IL 60606

Phone Number: 312-984-2167 Fax Number: 312-276-9691

E-Mail Address: dcampbell@mcdermottlaw.com

Save As Clear Form



## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2929

Short Caption: Ortega v. Woods

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Michael Ortega

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

McDermott Will & Schulte LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/Samuel Barder Date: 4/20/26

Attorney's Printed Name: Samuel Barder

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 444 W. Lake Street, Suite 4000

Chicago, IL 60606

Phone Number: 312-984-7527 Fax Number: 312-276-9691

E-Mail Address: sbarder@mcdermottlaw.com

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........ 1

STATEMENT CONCERNING ORAL ARGUMENT ........ 1

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 3

I. Factual Background ........ 3

A. The events surrounding the underlying murder—July 12–13, 2003 ........ 3

B. The identification of Ortega ........ 5

C. Ortega's Trial ........ 6

II. Procedural History ........ 8

A. State court proceedings ........ 8

1. Direct appeal in state court ........ 8

2. Ortega's initial post-conviction petition ........ 8

3. Remand and second stage review ........ 13

B. Federal Habeas Petition ........ 15

SUMMARY OF THE ARGUMENT ........ 17

STANDARD OF REVIEW ........ 18

ARGUMENT ........ 20

I. The state appellate court unreasonably applied *Strickland* when it concluded that trial counsel's failure to "call" Ortega's alibi witnesses was a "reasonable trial strategy" ........ 20

A. The unrebutted evidence shows Johnson performed deficiently when he failed to conduct any investigation into the alibi witnesses—long before failing to call them at trial ........ 21

1. *Strickland* requires defense counsel to investigate exculpatory alibi witnesses ........ 21

2. The evidence is unrebutted that Johnson failed to investigate alibi witnesses ........ 24

B. The First District's decision that trial counsel's performance "was not constitutionally deficient" was objectively unreasonable under *Strickland* ............................... 30

II. Ortega was prejudiced by trial counsel's failure to investigate the alibi witnesses—had counsel done so, there is a reasonable probability the outcome of the trial would have been different ........... 34

A. Trial counsel's failure to investigate alibi witnesses prejudiced Ortega ............................................................... 35

1. The complete failure to investigate alibi witnesses necessarily prejudices a defendant ................................. 35

2. There is a reasonable probability that the outcome of Ortega's trial would have been different had Johnson actually investigated the alibi witnesses .......... 37

B. The First District's prejudice analysis was flawed and objectively unreasonable .......................................................... 39

1. The First District employed the wrong legal standard ......................................................................... 40

2. The First District mischaracterized the evidence against Ortega as "strong" ............................................. 41

3. The First District erred when it reflexively discounted family member testimony as automatically not credible ............................................. 42

III. Ortega is entitled to relief under § 2254 and this Court must decide the proper remedy .................................................................. 43

A. The Court should grant a conditional writ of habeas corpus now ........................................................................ 43

B. Alternatively, the Court should order an expedited evidentiary hearing ................................................................ 44

CONCLUSION ........................................................................................ 46

CERTIFICATE OF COMPLIANCE WITH RULE 28.1 ............................................ 47

CERTIFICATE OF FILING AND SERVICE ........................................................ 48

CIRCUIT RULE 30(d) STATEMENT ................................................................ 49

REQUIRED SHORT APPENDIX ......................................................................... 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Avila v. Richardson*,
751 F.3d 534 (7th Cir. 2014) ..................................................................... 18

*Blackmon v. Williams*,
823 F.3d 1088 (7th Cir. 2016) ..........................................21, 23, 27, 34–37, 39, 42

*Brady v. Pfister*,
711 F.3d 818 (7th Cir. 2013) ........................................................ 23, 29, 34, 42–43

*Bryant v. Scott*,
28 F.3d 1411 (5th Cir. 1994) ..................................................................... 23

*Campbell v. Reardon*,
780 F.3d 752 (7th Cir. 2015) ..............................................20, 26–29, 35, 37–38, 42

*Code v. Montgomery*,
799 F.2d 1481 (11th Cir. 1986) ................................................................... 23

*Crisp v. Duckworth*,
743 F.2d 580 (7th Cir. 1984) ..................................................................... 22

*Cullen v. Pinholster*,
563 U.S. 170 (2011) ................................................................................ 19

*Czech v. Melvin*,
904 F.3d 570 (7th Cir. 2018) ..................................................................... 18

*Dunn v. Neal*,
44 F.4th 696 (7th Cir. 2022)....................................................................... 41

*Fisher v. Gibson*,
282 F.3d 1283 (10th Cir. 2002) ................................................................... 23

*Ford v. Reagle*,
154 F.4th 884 (7th Cir. 2025)..................................................................... 19

*Guinan v. United States*,
6 F.3d 468 (7th Cir. 1993) .......................................................................... 9

*Harris v. Reed*,
894 F.2d 871 (7th Cir. 1990) ..................................................................... 22

*Huffington v. Nuth*,
140 F.3d 572 (4th Cir. 1998) ............................................................ 23

*Jones v. Calloway*,
842 F.3d 454 (7th Cir. 2016) ............................................................ 35

*Lawrence v. Armontrout*,
900 F.2d 127 (8th Cir. 1990) ............................................................ 23

*Lee v. Kink*,
922 F.3d 772 (7th Cir. 2019) ............................................................ 29

*Lord v. Wood*,
184 F.3d 1083 (9th Cir. 1999) ............................................................ 23

*McMullen v. Dalton*,
83 F.4th 634 (7th Cir. 2023)............................................................ 19

*Mosley v. Atchison*,
689 F.3d 838 (7th Cir. 2012) ..............................19–22, 27, 35, 37–38, 41

*Pavel v. Hollins*,
261 F.3d 210 (2d Cir. 2001)............................................................ 22

*People v. Domagala*,
2013 IL 113688............................................................ 12, 13

*People v. Flores*,
128 Ill. 2d 66 (1989)............................................................ 31, 33, 39, 42

*People v. Ortega*,
419 Ill. Dec. 765 (2018)............................................................ 15

*People v. Ortega*,
2017 IL App (1st) 151326-U............................................................ 15

*People v. Ortega*,
399 Ill. App. 3d 1222 (1st Dist. 2010) ............................................................ 13

*People v. Ortega*,
225 Ill. 2d 662 (2007)............................................................ 8

*People v. Ortega*,
369 Ill. App. 3d 1048 (1st Dist. 2007) ............................................................ 8

*People v. Ortega*,
No. 03CR19185-01 (Ill. Cir. Ct. 2008)............................................................ 12

*People v. Peterson*,
2017 IL 120331 .......... 9

*People v. Smith*,
185 Ill. 2d 532 (1999) .......... 39–40

*People v. Tate*,
2012 IL 112214 .......... 9

*People v. Veach*,
2017 IL 120649 .......... 9

*Raygoza v. Hulick*,
474 F.3d 958 (2007) .......... 20, 22–23, 25, 28–30, 34, 36–37, 39, 42–43

*Rivera Alicea v. United States*,
404 F.3d 1 (1st Cir. 2005) .......... 22

*Rolan v. Vaughn*,
445 F.3d 671 (3d Cir. 2006) .......... 22–23

*Stitts v. Wilson*,
713 F.3d 887 (7th Cir. 2013) .......... 20–21, 23, 27, 34–36, 39, 42

*Strickland v. Washington*,
466 U.S. 668 (1984) .......... *passim*

*Sullivan v. Fairman*,
819 F.2d 1382 (7th Cir. 1987) .......... 22

*Towns v. Smith*,
395 F.3d 251 (6th Cir. 2005) .......... 23

*United States v. Mohammed*,
863 F.3d 885 (D.C. Cir. 2017) .......... 22

*Washington v. Smith*,
219 F.3d 620 (7th Cir. 2000) .......... 22

*Wiggins v. Smith*,
539 U.S. 510 (2003) .......... 28–29, 33

*Williams v. Taylor*,
529 U.S. 362 (2000) .......... 20, 30

**Statutes**

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

28 U.S.C. § 2254 et seq. .......... *passim*

**Other Authorities**

7th Cir. R. 34(f) .......... 1

Fed. R. App. P. 34(a) .......... 1

Gary L. Wells et al., *A Test of Simultaneous vs. Sequential Lineup Methods*, American Judicature Soc'y (2011), available at https://perma.cc/SH2H-RSUB .......... 25

## JURISDICTIONAL STATEMENT

Nearly eight years ago, on May 22, 2018, Petitioner-Appellant Michael Ortega ("Ortega") filed his *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Dkt. 1.)[1]

Ortega now brings this appeal from a final judgment of the District Court for the Northern District of Illinois denying his petition. (SA.001–002.) Ortega timely filed his notice of appeal on October 27, 2022. (Dkt. 53; Dkt. 54.) The District Court had jurisdiction over Ortega's habeas petition pursuant to 28 U.S.C. §§ 1331 and 2254(a). This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2254.

## STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Ortega requests oral argument because "the decisional process would [] be significantly aided by oral argument" in this case involving substantial questions of habeas law. *See also* 7th Cir. R. 34(f).

## STATEMENT OF THE ISSUES

On April 17, 2026, this Court issued a certificate of appealability directing the parties to address "whether Ortega's trial counsel was ineffective for not investigating potential alibi witnesses for his defense." (App. Dkt. 18.) In the habeas context, this requires Ortega to show that the Illinois Appellate Court's decision denying his post-

[1] Citations to the Short Appendix filed with this brief are: "(SA.---)." Citations to the Appendix filed with this brief are: "(A.---). Otherwise, citations to the District Court's docket are: "(Dkt. _)." Citations to the Seventh Circuit's docket are: "(App. Dkt. _)."

conviction petition involved an unreasonable application of clearly established law, here *Strickland v. Washington*, 466 U.S. 668 (1984).

*Strickland* established a two-prong test for evaluating ineffective assistance of counsel claims. 466 U.S. at 687. If both prongs of the *Strickland* test are satisfied and the state court's application of *Strickland* was unreasonable, this Court must then decide the proper remedy. There are thus three issues on appeal:

1. Did the Illinois appellate court unreasonably apply *Strickland* when it held that trial counsel did not perform deficiently even though counsel failed to investigate alibi witnesses whose identities and exculpatory testimony were made known to him before trial?

2. Did the Illinois appellate court unreasonably apply *Strickland* when it concluded that trial counsel's failure to investigate alibi witnesses did not prejudice Ortega?

3. Should this Court grant Ortega's petition for habeas relief now or must it remand this case to the District Court for an evidentiary hearing?

## STATEMENT OF THE CASE

### I. Factual Background

#### A. The events surrounding the underlying murder—July 12–13, 2003

At approximately 2:30 a.m. on the morning of July 13, 2003, Kenneth Lawson was murdered in Chicago. The events leading up to that murder are as follows.

On July 12, 2003, at around 7:00 p.m. Jeremy Howard arrived at the home of his friend Lawson. (Dkt. 10-19 at 9.) They called a third friend, Marlin Willis, and agreed to meet at a gas station before heading to a party at Shirly McBride's home at 8130 S. Houston Avenue, in Chicago. (SA.025; Dkt. 10-19 at 10–11.) According to Howard, the three men met between 10:30 and 11:00 p.m. and arrived at McBride's party around 11:00 p.m. in Lawson's van. (Dkt. 10-19 at 10–11; *see* Dkt. 10-19 at 100–01.) After arriving at the party, Howard, Lawson, and another friend left to purchase a "fifth of Bacardi." (Dkt. 10-19 at 52.) After returning to the party, Howard and Lawson drank the Bacardi; Willis drank beer. (*Id.* at 54, 150–51.)

At some point after that, a Hispanic man[2] wearing a "dark-colored bandana" approached McBride's home. (SA.025; Dkt. 10-19 at 20–21, 105.) Howard testified that the man "walked up, [] threw a gang sign, and [] said something like, 'Latin King,' to Kenneth." (Dkt. 10-19 at 20, 105 (Willis confirming the same).) Lawson told the man to "get away from [him]." (SA.025; Dkt. 10-19 at 21.) Lawson and the man "started arguing," but there was no physical altercation. (SA.025; Dkt. 10-19 at 22–23.) According to Howard, after about five minutes, the bandanaed man left, said he

[2] The evidence is unrebutted that this man was *not* Ortega. (*See* A.030.)

would be back and when he returned, "we shouldn't be there."[3] (SA.025; Dkt. 10-19 at 24.) According to Willis,[4] the three men (Lawson, Willis, Howard), and a few others began to leave the party so there "wouldn't be a confrontation." (SA.026; Dkt. 10-19 at 111–12.)

But before they actually left, the bandanaed man returned, now joined by another Hispanic man.[5] (SA.026; Dkt. 10-19 at 25–27 (Howard stated he returned "[a]nywhere in between 3 to 5 minutes" later), 113 (Willis testified the man returned "[t]wo or three minutes later").) According to Howard, the two men walked up to the van. (Dkt. 10-19 at 27–28.) Lawson was inside the van; Willis was standing outside the van next to Howard. (*Id.*) The second man asked the bandanaed man, "Which one was it?" as they approached. (SA.026; Dkt. 10-19 at 28, 114.) The bandanaed man pointed at Lawson who was sitting inside the van. (Dkt. 10-19 at 29, 114.) At that time, Lawson exited the van and began arguing with the second man. (SA.026; Dkt. 10-19 at 30, 115.) Howard testified that he grabbed Lawson to break the two men up as the "loud" fighting continued. (Dkt. 10-19 at 31–32.) Howard wrestled Lawson into the front seat of the van and closed the door. (*Id.* at 31, 115.) Lawson then got out of the van, saying he would walk home. (*Id.* at 32, 115–16.) Lawson and

---

[3] Howard and Willis stated the bandanaed man walked (or "trott[ed]") away from the house. (Dkt. 10-19 at 25, 111.)

[4] Willis also testified he had been a member of the Four Corner Hustlers gang. (Dkt. 10-19 at 107.)

[5] Howard and Willis identified this second man as Ortega. *See* Section B, *infra*. Howard and Willis did not testify to knowing Ortega before the shooting. (*See generally* Dkt. 10-19 at 7–152.)

the second man walked away from the van and continued to argue. (*Id.* at 33–34, 118.)

Howard and Willis testified that they then saw the second man draw a revolver and fire a shot at Lawson. (SA.026; Dkt. 10-19 at 35, 119.) Lawson walked for a moment before collapsing. (SA.026; Dkt. 10-19 at 36–37.) The shooter fled and was not seen again. (Dkt. 10-19 at 37, 119.) Howard and Willis stayed with Lawson until paramedics arrived, and Howard followed them to Christ Hospital where Lawson was pronounced dead. (*Id.* at 38–39, 121–22.)

The trial testimony does not identify the time of the shooting with specificity. Officer Peter Edwards testified to receiving a call at 2:40 a.m. that morning instructing him to guard the crime scene. (*Id.* at 154.) At one point during Howard's direct examination, the State said, "Now, this shooting happened around 2:30 in the evening." (*Id.* at 47.) The State repeated this as the time of the shooting in its closing argument. (*See* Dkt. 10-20 at 61–62 ("At approximately 2:30 a.m. on July 13, 2003 . . . . ."))

### B. The identification of Ortega

On July 25, 2003, 12 days after the shooting, Detective James Fitzmaurice presented Howard with a photo array of six individuals. (Dkt. 10-19 at 40, 186.) Ortega's photograph was in the photo array and Howard identified Ortega as the shooter of Lawson. (SA.026; Dkt. 10-19 at 41, 186–87.) On August 5, Ortega appeared in an in-person lineup of four men, presented by Detective Patrick Madden

at Area 2 Police Headquarters, and Howard identified Ortega as the shooter of Lawson. (SA.026; Dkt. 10-19 at 42, 215–16.)

On August 7, Willis (then in custody at Cook County Jail on an unrelated charge) identified Ortega as the shooter of Lawson after reviewing a photo array of six individuals presented by Detective Jarrod Smith. (SA.026; Dkt. 10-19 at 123, 236–37.) Willis never identified Ortega in an in-person lineup.

### C. Ortega's Trial

Ortega was indicted on September 3, 2003 and charged with first degree murder. (Dkt. 10-17 at 11; Dkt. 10-18 at 8.) Through the help of his mother, Ortega retained attorney Michael Johnson as his defense counsel. Ortega's trial began on November 18, 2004.

At trial, Howard and Willis testified that they saw Ortega fire the shot that killed Lawson. (SA.026; Dkt. 10-19 at 35, 119.) Howard's and Willis's testimony was the only evidence the State presented against Ortega. The State offered no other eyewitness testimony against Ortega; it offered no documentary evidence against Ortega; and it offered no physical or forensic evidence against Ortega.

In his defense, Ortega categorically denied that he was the shooter. (Dkt. 10-20 at 19–20.) He testified at trial that he did not remember where he was on the night in question. (*Id.* at 19–20.) Ortega also testified that he lived at his mother's house at 8315 South Colfax, (*Id.* at 26–27), which the Illinois appellate court later noted was "about 12 blocks from the shooting." (A.032.) Johnson presented no defense evidence other than Ortega's testimony. (*See generally* Dkt. 10-20.)

Johnson offered a single defense: Howard and Willis had misidentified Ortega as the shooter. (SA.026; Dkt. 10-18 at 139–41; Dkt. 10-19 at 80–89, 141–45; Dkt. 10-20 at 81–86.) In support of this defense, he elicited testimony on cross-examination that both Howard and Willis had been drinking at the party, thus impairing their ability to make an accurate identification.[6] (Dkt. 10-19 at 53–54, 150–51.) He also impeached their testimony by eliciting concessions from them that their descriptions of the shooter at trial were inconsistent with earlier statements they had provided to the police, (SA.026–027; Dkt. 10-19 at 62–63), and that the lighting conditions were problematic at the crime scene, (Dkt. 10-19 at 47, 133–34). Johnson also identified inconsistencies in statements that Howard had made to the grand jury, to prosecutors, and at trial. (*Id.* at 60–64.)

Despite presenting the defense that the eyewitnesses had misidentified Ortega, Johnson called no alibi witnesses to establish that Ortega was not at the crime scene. (*See generally* Dkt. 10-18; 10-19; 10-20.)

The trial, including jury selection, lasted 3 days. (*See generally* Dkt. 10-18; 10-19; 10-20.) On November 22, 2004, the jury found Ortega guilty of first degree murder. (Dkt. 10-20 at 144.) On January 7, 2005, the Circuit Court of Cook County entered judgment on the conviction and sentenced Ortega to forty-six years in prison. (Dkt. 10-23 at 6.)

---

[6] While not directly probative of how much alcohol Howard and Willis had consumed, Doctor Clare Cunliffe from the Cook County Medical Examiner's Office testified that Lawson's blood alcohol content tested after his death was "almost" twice the legal limit in Illinois, and that this figure would be "pretty accurate" as to his blood alcohol content at the time of death. (Dkt. 10-18 at 165.)

## II. Procedural History

Ortega filed a direct appeal and post-conviction habeas petition in the state courts. Both were denied. He then filed this federal habeas petition which the District Court denied.

### A. State court proceedings

#### 1. Direct appeal in state court

On July 12, 2006, Ortega appealed his conviction in state court and argued, among other things, that he had received ineffective assistance of counsel at trial.[7] (SA.027.) The Appellate Court affirmed his conviction on February 7, 2007. *See People v. Ortega*, 369 Ill. App. 3d 1048 (1st Dist. 2007) (unpublished); (A.040). On September 26, 2007, the Illinois Supreme Court denied Ortega's petition for leave to appeal—that petition also included the ineffective assistance of counsel claim. *People v. Ortega*, 225 Ill. 2d 662 (2007) (unpublished); (Dkt. 10-8 at 1).

#### 2. Ortega's initial post-conviction petition

On July 2, 2008, Ortega filed a *pro se* post-conviction petition in Illinois state court. (Dkt. 10-21 at 35.) In his petition, he raised several claims, now including the specific claim that his trial counsel had been ineffective when he failed to investigate potential alibi witnesses whose existence and exculpatory testimony had been made

[7] Ortega's initial ineffective assistance of counsel claim alleged that Johnson performed ineffectively by failing to call an expert witness to challenge the credibility of the eyewitness testimony. (A.036.) It did not raise an ineffectiveness challenge due to counsel's failure to investigate the alibi witnesses.

known to him before trial.[8] (*Id.* at 55.) Ortega argued that Johnson, despite being told that Ortega's mother Louise and sister Leticia could both provide alibi testimony, failed to interview either of them and never investigated the alibi defense. (*Id.* at 55.) Ortega asserted that both Louise and Leticia would have testified that he was at Louise's house at the time of the shooting. Ortega also alleged that Johnson conducted no further review or investigation. (*Id.* at 55; SA.027.) Ortega proffered his own affidavit, as well as affidavits from his mother Louise and his sister Leticia, with this petition. (A.047–051; SA.027.)

Ortega's affidavit is dated June 19, 2008. (SA.041–046.) He explained that he "d[id] not specifically remember the night of July 12th and early morning of July 13th, 2003." (A.044.) He added that his "mother, Louise Ortega, and sister, Leticia, do remember specifically where I was, being at my mother's home." (A.044.)

---

[8] Ortega raised this failure to investigate claim for the first time in his first post-conviction petition. (*Id.* at 55–56.) Although "a defendant must generally raise a constitutional claim alleging ineffective assistance of counsel on direct review or risk forfeiting the claim . . . .[,] default does not . . . preclude a defendant from raising an issue on collateral review that depended upon facts not found in the record." *People v. Veach*, 2017 IL 120649, ¶ 47. Ortega's claim, raised for the first time in the post-conviction proceeding, met this standard. He asserted that Johnson had rendered ineffective assistance of counsel by not investigating alibi witnesses made known to him, a claim which depended upon facts not found in the trial or direct appeal record. Ortega's post-conviction petition was supported by affidavits the first time it was raised and was "based on what trial counsel should have done, not on what counsel did." *People v. Tate*, 2012 IL 112214, ¶ 14.

Thus, this claim is appropriately preserved. *See id.* ("[A] claim based on what ought to have been done may depend on proof of matters which could not have been included in the [trial] record precisely because of the allegedly deficient representation."); *see also Veach*, 2017 IL 120649, ¶ 46; *People v. Peterson*, 2017 IL 120331, ¶ 81; *Guinan v. United States*, 6 F.3d 468, 473–75 (7th Cir. 1993) (Easterbrook, J., concurring) (explaining that ineffective assistance of counsel claims are best raised collaterally—"direct appeal is the wrong tribunal at the wrong time" for ineffective assistance claims).

In Louise's affidavit, she explained she "knows for certain that Michael did not sho[o]t and kill the young man on July 13, 2003 because Michael was at my home" that night. (A.047.) She "recall[ed] it being the weekend after the July 4th weekend and the weekend before my daughter gave birth and how thankful I was Michael was home safe that night." (*Id.*) Leticia, Michael, and Louise's other two sons were at her home, as was her then-boyfriend, Venustiano "Benny" Avila.[9] Louise recalled that she and her boyfriend Avila argued in her home that night, and that she threatened to call the police. (A.048.) Because of the argument, Avila left Louise's house at around 12:30 a.m. on July 13th. (*Id.*) Louise remembered Leticia being upset that Ortega did not intervene in Louise's fight with Avila. (*Id.*) She recalled that Ortega was present during the argument, but that he paid no attention to it because he had his headphones on and was listening to music. (*Id.*)

After Avila left, Louise recalled that she and Leticia talked in the kitchen until about 2:15 a.m. as Louise "calm[ed] down" after her argument with Avila. (*Id.*) Throughout this time, Ortega remained present, sitting on the sofa in Louise's home. (*Id.*) When Louise went to bed at 2:15 a.m., Ortega was still sitting on the sofa, listening to music, and Leticia was in the same room. (*Id.*) Louise's other children were asleep in their beds. (*Id.*) When Louise woke up "later that morning," she stated

[9] On May 4, 2026, the undersigned counsel learned for the first time while preparing this brief that Avila is reported to be the biological father of one of Ortega's younger siblings. But neither Ortega nor Leticia have any biological or family relationship with Avila. In proceedings below, and in this Court, Avila has been referred to as a "non-family member," (*see*, *e.g.*, Dkt. 28 at 6; App. Dkt. 3 at 9), or someone with "no direct family relation to Ortega," (Dkt. 16 at 15). Those representations remain true; Ortega and Avila are not family members. But out of its duty of completeness and in fairness to this Court, counsel advises the Court of what it recently learned.

that Leticia and Ortega had not left that room. (*Id.*) This timing is significant. Taking as true the State's assertion at trial that the crime occurred around 2:30 a.m., (*see* Dkt. 10-19 at 47, 154; Dkt. 10-20 at 61–62), this places Ortega at his home, "about 12 blocks" away, minutes before the shooting occurred. (*See* A.032).

In her affidavit, Louise explains that Johnson was notified of this critical alibi testimony. She stated that Ortega told Johnson before trial began about his mother's recollection and told Johnson that both Louise and Leticia would testify on his behalf. (A.049.) But according to Louise, Johnson "told Michael that he would not call me to testif[y without] something like . . . receipts to support his alibi," and that because she was family no one "would believe" her. (*Id.*) Louise explained that "Mr. Johnson never interviewed [me] nor discuss[ed] my possible testimony. When I arrived at the courthouse for Michael's trial, I confronted Mr. Johnson about [this], but Mr. Johnson told me that he made the decisions on who to call to testify." (*Id.*)

Leticia's affidavit corroborated her mother's affidavit. First, Leticia explained why she had such a clear recollection of the night in question: "I specifically recall that night because I was at my mother's house, due to my pregnancy, and when I heard the news about the murder, I thought about the fact that a life was lost and I was about to give birth to a new life." (A.050.) Leticia swore that she remembered the night in question because she and her son had slept over at her mother's home that night because of pregnancy-related pain. (A.051.) Leticia gave birth the following week. (A.050.)

Second, Leticia was clear that Ortega could not have been the shooter. She swore that during the critical hours, Ortega was at her mother's home and could not have been the shooter. (A.051.)

Leticia's affidavit corroborates Louise's in every respect—her two other brothers were both present in her mother's home; Avila left around 12:30 a.m.; she recalled being upset with Ortega for failing to intervene in her argument with Avila; and she sat with her mother until approximately 2:00 a.m. (A.051.) She remembered Ortega being present the entire time until she went to sleep around 2:00 a.m. (*Id.*) At that time, Leticia told Ortega "to get off the sofa so my son and I could go to sleep." (*Id.*) Ortega moved to the love seat and was still there when Leticia woke up the next morning. (*Id.*) Leticia told Ortega she would testify on his behalf, but Ortega explained that his lawyer said because she "was family [and] no one would believe" her. (*Id.*) Johnson "never interviewed" her. (*Id.*)

On August 21, 2008, the Circuit Court of Cook County dismissed Ortega's petition at the first stage,[10] finding it frivolous and without merit. *People v. Ortega*, No. 03CR19185-01; (Dkt. 10-9 at 45). On June 8, 2010, the Illinois First District Appellate Court reversed that dismissal, finding that the claim "did not lack an arguable basis in either law or fact." *People v. Ortega*, 399 Ill. App. 3d 1222 (1st Dist. 2010) (unpublished); (A.025). The First District remanded the case to the Circuit Court of Cook County to continue to the second stage of post-conviction review. (*Id.*)

[10] Illinois has a three-stage process for challenging criminal convictions "on grounds of constitutional violations." *People v. Domagala*, 2013 IL 113688, ¶ 32 (citing 725 ILCS 5/122-1 *et seq.* (Post-Conviction Hearing Act)). At the first stage, the circuit court dismisses petitions that are "frivolous or patently without merit." *Id.*

### 3. Remand and second stage review

On remand to the Circuit Court of Cook County for second stage review, Ortega was represented by a public defender.[11] (This was the first time he had counsel during his post-conviction efforts.) He filed a supplemental petition on January 16, 2014 that included supplemental affidavits from both Louise and Leticia. (Dkt. 10-23 at 47; A.052–055.) Ortega requested an evidentiary hearing on the failure to investigate his alibi witnesses. (Dkt. 10-23 at 60.)

Louise's November 5, 2012 supplemental affidavit reiterated her earlier one, and provided additional details. She explained that Ortega did not drive, had no driver's license or insurance, and did not have keys to her car. (A.052.) She drove him places because the neighborhood had a "hostile gang." (*Id.*)

She also provided details about a conversation she had directly with Johnson in either late 2003 or early 2004, approximately one year before the start of Ortega's trial. (*Id.*) This conversation occurred in the hallway outside the judge's courtroom before a pretrial conference. (*Id.*) Louise explained that she had told Johnson that Leticia had reminded her the shooting was the day of Leticia's baby shower. (*Id.*) Further, Louise told him that Ortega was home the entire night, that Avila was

[11] At the second stage, the circuit court "determine[s] whether the petition and any accompanying documentation make a 'substantial showing of a constitutional violation.'" *Domagala*, 2013 IL 113688, ¶ 33 (citation omitted).

present, and that Leticia recalled being upset over Ortega's failure to intervene during her dispute with Avila. (*Id.*)

After informing Johnson of these details, "Johnson did not ask [Louise] any questions about the night of the shooting, nor did he ask [Louise her] daughter's name [or] phone number, or how to contact her." (*Id.*) Johnson repeated what he had previously told Ortega—Louise needed "some receipt like an airplane receipt" to "prove" Ortega's whereabouts. (*Id.*) She also understood that Johnson had "never used an investigator in the case," although she "would have been willing to pay for one if he had asked me." (A.053.)

Leticia's July 15, 2013, supplemental affidavit corroborated Louise's recollections. Leticia affirmed that she "had a baby shower that day" and spent the night at her mother's house with her son. (A.054.) She described going to bed on the couch next to Ortega around 2:15 a.m. on July 13, 2003. (*Id.*) She explained that the house has "one door" and "[i]f Michael had gone off the couch before I fell asleep, or when I just fell asleep, I definitely would have heard him. I am a light sleeper." (*Id.*) She specifically remembered that Ortega did not move off the couch and was there when she woke up "around 8:00–9:00 a.m." (*Id.*) Leticia reiterated that Johnson never questioned her about any details, never discussed the possibility that she might be called to testify, nor did he give her the opportunity to do so. (A.055.) Like her mother, she would have testified to Ortega's actual whereabouts the night of the shooting. (*Id.*)

On September 9, 2014, the State moved to dismiss this supplemental petition. (A.011.) The Circuit Court of Cook County granted that motion on March 19, 2015 and dismissed Ortega's post-conviction petition. (A.017.) The Circuit Court found Ortega failed to make the required substantial showing of a constitutional violation. (*Id.*) On October 20, 2017, the First District Appellate Court affirmed that dismissal. *People v. Ortega*, 2017 IL App (1st) 151326-U. The Illinois Supreme Court denied Ortega's motion for leave to appeal on January 18, 2018. *See People v. Ortega*, 419 Ill. Dec. 765 (unpublished).

**B. Federal Habeas Petition**

On May 22, 2018, Ortega timely petitioned for a writ of habeas corpus under 28 U.S.C. § 2254 in the District Court for the Northern District of Illinois. Judge Kennelly, then-presiding, "conclude[d] that Ortega's claim may have merit" and appointed undersigned counsel "to explore the viability of Ortega's claim, as well as whether an evidentiary hearing should be held." (SA.035, SA.040.)

On February 24, 2020, Ortega, now represented by undersigned counsel, moved for an evidentiary hearing. (Dkt. 28.) On February 28, 2020, this case was transferred to Judge Kness as part of a routine case reassignment. (Dkt. 30.) The State responded on March 18, 2020, (Dkt. 34) and Ortega replied on June 15, 2020, (Dkt. 40).

On July 22, 2021, when the motion had been fully briefed and pending for over a year without resolution, Ortega petitioned for a status conference. (Dkt. 47.) On July 28, 2021, the Court issued an order stating that no status conference was

necessary and that Ortega's motion was "under active consideration." (Dkt. 48.) Approximately thirteen months later, on August 15, 2022, Ortega filed another motion for a status conference as the fully briefed matter had then been pending for over two years without resolution. (Dkt. 49.)

This motion for a status conference was never decided. Instead, on September 27, 2022, the District Court denied Ortega's habeas petition outright and concluded that there was no need for an evidentiary hearing. (SA.023.) The District Court also declined to issue a certificate of appealability finding Ortega could not "make a substantial showing of the denial of a constitutional right, nor can he show that reasonable jurists would debate, much less disagree with, this resolution of his claims." (*Id.*)

Ortega timely appealed to this Court on October 26, 2022, (Dkt. 53), and on November 2, 2022, moved for a certificate of appealability.

The motion for a certificate of appealability then pended before this Court for three and a half years. (*See generally* App. Dkt.) On April 17, 2026, nearly eight years after Ortega's habeas petition was first filed, this Court granted the certificate of appealability. (App. Dkt. 18.) The Order found "that Ortega has made a substantial showing of the denial of his right to effective assistance of counsel" and directed the parties to brief "whether Ortega's trial counsel was ineffective for not investigating potential alibi witnesses for his defense." (*Id.*)

## SUMMARY OF THE ARGUMENT

Trial counsel's failure to investigate known alibi witnesses was ineffective assistance of counsel that prejudiced Ortega. These failures entitle him to habeas relief.

Under controlling law, Johnson had an absolute duty to investigate alibi witnesses whose specific identities and proffered testimony were known to him well before trial. The evidence is clear and unrebutted that he failed to do so. The First District's finding of no deficient performance was objectively unreasonable under AEDPA. The First District found that because Johnson "was aware of" Louise and Leticia's testimony, and Ortega could not remember where he was on July 12–13, 2003, Johnson's decision "not to call" them was strategic. (A.008.) But the First District's analysis is not only flawed, it completely misses the point. Although it may be a reasonable strategic decision not to *call* an alibi witness to testify after an appropriate investigation, that is not the question presented here. The only question presented here is whether Johnson's failure to *investigate* the known alibi witnesses passes muster under *Strickland*. It does not. Johnson's failure to investigate known alibi witnesses who could have presented exculpatory testimony was a per se violation of what *Strickland* requires, as this Court has repeatedly held.

This failure to investigate prejudiced Ortega, as there was a reasonable probability of a different outcome at trial had trial counsel performed effectively. Had trial counsel investigated the alibi witnesses, it would have transformed the trial from a two-on-zero rout (Howard and Willis versus an unremembering Ortega) to a

two-on-two (or better) battle, directly pitting the State's eyewitnesses against Louise and Leticia, and others, including Avila.

The First District's finding of no prejudice was objectively unreasonable, and its analysis was rife with errors. It misstated and misapplied the operative test, mischaracterized the evidence, and improperly discounted the value of the proposed alibi testimony.

On the record before this Court, which demonstrates both a cognizable constitutional error and at least a "reasonable probability" that but for the constitutional error the outcome of the trial would have been different, the requested habeas relief is warranted.

In light of the many delays in this case, Ortega requests that this relief be granted expeditiously.

## STANDARD OF REVIEW

Ortega's habeas petition is governed by 28 U.S.C. § 2254, as amended by AEDPA. This Court reviews *de novo* the District Court's denial of a habeas petition under 28 U.S.C. § 2254. *Avila v. Richardson*, 751 F.3d 534, 536 (7th Cir. 2014).

Under AEDPA, habeas relief can only be granted when the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" *Czech v. Melvin*, 904 F.3d 570, 573 (7th Cir. 2018) (quoting 28 U.S.C. § 2254(d)). "For relief under the 'unreasonable application' prong of § 2254(d)(1), the state court's application of precedent must be objectively

unreasonable[.]" *McMullen v. Dalton*, 83 F.4th 634, 643 (7th Cir. 2023) (citations and quotation marks omitted).

The "clearly established federal law" here is *Strickland v. Washington*, 466 U.S. 668 (1984), which establishes the standard for evaluating ineffective assistance of counsel claims. *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). On habeas review of an ineffective assistance of counsel claim, "federal courts must indulge two presumptions: under AEDPA, [courts] presume that the state courts know and follow the law, and under *Strickland*, [courts] presume that defense counsel rendered adequate assistance and exercise[d] . . . reasonable professional judgment." *Ford v. Reagle*, 154 F.4th 884, 894 (7th Cir. 2025) (citations and quotations marks omitted).

To overcome this double presumption of adequate assistance, Ortega "must prove that his attorney's performance was deficient—that is, that it 'fell below an objective standard of reasonableness' under all the circumstances; and that counsel's deficient performance prejudiced his defense." *Id.* (quoting *Strickland*, 466 U.S. at 687–88). To prove prejudice, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.'" *Mosley v. Atchison*, 689 F.3d 838, 851 (7th Cir. 2012) (quoting *Strickland*, 466 U.S. at 694).

"[A] state prisoner's federal habeas claim is considered against the last reasoned state court decision on the merits." *Ford*, 154 F.4th at 894 (citation and quotation marks omitted). Here that decision is the 2017 Illinois Appellate Court

decision on Ortega's second stage petition for post-conviction relief, (*see* A.001). Ortega must show that this decision was "objectively unreasonable" under *Strickland*. *Williams v. Taylor*, 529 U.S. 362, 390, 409 (2000).

If this Court determines "the state court decision was an unreasonable application of *Strickland*," *Stitts v. Wilson*, 713 F.3d 887, 895 (7th Cir. 2013), and thus that § 2254(d)(1) has been met, "that will often show that petitioner is entitled to relief, but . . . not . . . always and automatically[.]" *Mosley*, 689 F.3d at 853. "Whether the petitioner is actually entitled to relief—whether under § 2254(a) he is in custody in violation of the Constitution or laws and treaties of the United States—is a separate question." *Id.* If so, this Court should grant him a conditional writ. *See*, *e.g.*, *Raygoza v. Hulick*, 474 F.3d 958, 965–66 (2007). If the petitioner's entitlement to relief remains an open question, this Court should remand for an evidentiary hearing specifically tailored to address unanswered factual questions. *See*, *e.g.*, *Campbell v. Reardon*, 780 F.3d 752, 772–773 (7th Cir. 2015).

## ARGUMENT

### I. The state appellate court unreasonably applied *Strickland* when it concluded that trial counsel's failure to "call" Ortega's alibi witnesses was a "reasonable trial strategy"

"To establish deficient performance under *Strickland*, [Ortega] must identify acts or omissions by counsel that fell below an objective standard of reasonableness and could not have been the result of professional judgment." *Campbell*, 780 F.3d at 762 (citing *Strickland*, 466 U.S. at 688, 690). "[S]trategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. "[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

### A. The unrebutted evidence shows Johnson performed deficiently when he failed to conduct any investigation into the alibi witnesses—long before failing to call them at trial

First, the failure to investigate alibi witnesses is per se unreasonable under *Strickland*. Second, because Johnson failed to investigate the scope of the proffered alibi witness testimony, he performed deficiently.

#### 1. *Strickland* requires defense counsel to investigate exculpatory alibi witnesses

This Court has consistently held that a trial counsel's failure to interview known alibi witnesses or to investigate a known alibi defense demonstrates ineffective assistance of counsel under *Strickland*. *See Stitts*, 713 F.3d at 891–92 ("If trial counsel's investigation of a potential alibi defense was unreasonably limited, then trial counsel's decision not to present an alibi defense is too ill-informed to be considered reasonable."); *Blackmon v. Williams*, 823 F.3d 1088, 1104 (7th Cir. 2016) ("[A]n outright failure to investigate witnesses . . . is more likely to be a sign of deficient performance." (citation omitted)); *id.* ("Just one witness would have been able to give Blackmon a true alibi. . . . It is not reasonable strategy to leave such possible testimony unexplored under these circumstances."); *Mosley*, 689 F.3d at 848

("If, as [the alibi witnesses] claimed in their affidavits, Mosley's lawyer never found out what their testimony would be, he could not possibly have made a reasonable professional judgment . . . not to call [them] as a matter of trial strategy."); *Raygoza*, 474 F.3d at 964 ("In a first-degree murder trial, it is almost impossible to see why a lawyer would not have at least investigated the alibi witnesses more thoroughly."); *Washington v. Smith*, 219 F.3d 620, 629–32 (7th Cir. 2000) (finding ineffective assistance of counsel where trial counsel unsuccessfully tried to contact alibi witness three times and failed to contact other alibi witnesses); *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir. 1990) ("[A] decision made without interviewing the witnesses . . . and without consultation with [the defendant] was unreasonable professional conduct."); *Sullivan v. Fairman*, 819 F.2d 1382, 1392, 1389 (7th Cir. 1987) (finding ineffective assistance of counsel where trial counsel made only "perfunctory" attempts to locate alibi witnesses and did not call them at trial where counsel "had reason to know, from an objective standpoint, that a possible defense [was] available"); *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("[A]s a general rule an attorney must investigate a case in order to provide minimally competent professional representation.").[12]

[12] The Seventh Circuit joins *every* other circuit in finding deficient performance under *Strickland* when trial counsel failed to investigate known alibi witnesses. *See United States v. Mohammed*, 863 F.3d 885, 887, 890 (D.C. Cir. 2017) (holding that counsel's assistance was constitutionally deficient because "[t]he complete failure to investigate potentially corroborating witnesses . . . can hardly be considered a tactical decision." (citation omitted)); *Rivera Alicea v. United States*, 404 F.3d 1, 4 (1st Cir. 2005) ("Under the circumstances, there was a prima facie showing of objectively unreasonable attorney performance in failing either to investigate the situation or, at least, to interview two potentially crucial witnesses."); *Pavel v. Hollins*, 261 F.3d 210, 221–22 & n.14 (2d Cir. 2001) (finding deficient performance when counsel failed to investigate a witness who would "directly corroborate the defense's theory"); *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) ("Failure to conduct any

With the bedrock principle that the failure to investigate exculpatory witnesses constitutes deficient performance in hand, we turn to Johnson's failure to investigate.[13]

---

pretrial investigation is objectively unreasonable. . . . [Counsel] made no attempt to determine whether [potential alibi witnesses] might have other information potentially valuable to the defense."); *Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) ("This and other courts have held an attorney's representation deficient when he failed to contact and interview important prospective witnesses, especially when they were readily available or had been identified by the defendant prior to trial." (collecting cases)); *Bryant v. Scott*, 28 F.3d 1411, 1419 (5th Cir. 1994) ("Although factors tending to diminish [the witness's] credibility might support a strategic decision not to call [him] at trial, those considerations do not suggest that [counsel's] total failure to investigate [the witness's] testimony was a strategic decision."); *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) ("This duty [to investigate] includes the obligation to investigate all witnesses who may have information concerning his or her client's innocence. . . . A purportedly strategic decision [not to investigate] is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." (citation and quotation marks omitted)); *Lawrence v. Armontrout*, 900 F.2d 127, 129 (8th Cir. 1990) ("[O]nce [defendant] provided his trial counsel with the names of potential alibi witnesses, it was unreasonable of her not to make some effort to interview all these potential witnesses to ascertain whether their testimony would aid an alibi defense."); *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) ("A lawyer who fails adequately to investigate . . . information that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence the verdict, renders deficient performance.") (citation modified)); *Fisher v. Gibson*, 282 F.3d 1283, 1292 (10th Cir. 2002) (emphasizing that counsel has a duty "to investigate all reasonable lines of defense, or make reasonable determinations that such investigation is not necessary."); *Code v. Montgomery*, 799 F.2d 1481, 1483–84 (11th Cir. 1986) (finding deficient performance when defense counsel "terminated his investigation without determining whether the one witness he contacted could provide an alibi").

[13] This case has two underlying opinions from the District Court which purport to discuss the controlling law. Judge Kennelly's opinion, rendered before the case was reassigned to Judge Kness, carefully considered the Seventh Circuit cases when reviewing the failure to investigate issue. (SA.036–38.) (reviewing *Stitts*, and then discussing *Brady*, *Blackmon*, and *Raygoza*).) For Judge Kennelly, these cases show that a failure to investigate is "problematic." (SA.037.)

But in the subsequent opinion from Judge Kness that undergirds this appeal, the court mentions only one of these cases—*Blackmon*—noting "the requirement that counsel conduct a reasonable pre-decision investigation seeks to ensure only that counsel 'make[s] an informed decision' before trial." (SA.018 (citing *Blackmon*, 823 F.3d at 1103).) This constrained characterization does not capture the full thrust of the standard laid out by this Court in *Stitts* and its progeny, as well as the overwhelming authority from every other

### 2. The evidence is unrebutted that Johnson failed to investigate alibi witnesses

Louise and Leticia's affidavits agree on critical unrebutted facts: Johnson never interviewed Louise; he never interviewed (or even spoke with) Leticia; and he made no effort to corroborate their testimony. (A.049, A.051; A.053, A.055.) Louise's supplemental affidavit explained that she put Johnson on notice of her alibi outside the courtroom about a year before trial; she stated that Johnson "did not ask me any questions about the night of the shooting, nor did he ask me my daughter's name, nor did he ask me my daughter's phone number, or how to contact her." (A.052.) It is also unrebutted that Johnson never used an investigator to investigate the scope or whether the alibi witnesses could be corroborated with other evidence or testimony. (A.053.) Leticia swore that Johnson "never questioned me about testifying." (A.055.)

Johnson's failure to investigate takes on added significance in light of his trial strategy that Howard and Willis identified the wrong man. (A.002 ("At trial, defendant argued that the State's witnesses mistakenly identified him as the offender.").) But he marshaled no evidence—because he had conducted no investigation—to bolster the misidentification defense.[14]

---

circuit, which hold that the failure to investigate known alibi witnesses is textbook deficient performance.

[14] Johnson did take the time to attack the photo array and lineup processes used by the Chicago Police Department with Howard and Willis. The Chicago Police conducted all three of these identifications using a "simultaneous" technique, not a sequential one. (Dkt. 10-19 at 200–01, 217–19; Dkt. 10-20 at 90–92.) This was significant. As Johnson explained in his closing, a traditional lineup is a single sheet of photos—here, six individuals—and the witness is told to point to the culprit. (Dkt. 10-20 at 91.) In a sequential lineup, the officer shows the witness one photo at a time and asks if each is the culprit. Physical lineups work

"As an abstract matter, [trial counsel] was surely correct to think it is hard to win on an alibi defense." *Raygoza*, 474 F.3d at 963. Johnson may "have been correct to conclude that a defendant is in a weak spot if the only alibi witness he can offer is his mother, or perhaps just a mother and a girlfriend." *Id.* "But generalities fall away when we are dealing with an 'n' of one: it is the facts of the particular case, and the particular alibi defense, that matter." *Id.*

Johnson's failure to investigate led to a cascade of missed opportunities (i.e., errors) that, had they been pursued, would have altered the entire defense case. Even the most rudimentary investigation by Johnson would have accomplished the following:

- Louise would have testified to Ortega's whereabouts in the early hours of July 13, 2003, (A.052–053);
- Leticia would have testified to Ortega's whereabouts in the early morning hours of July 13, 2003, (A.054–055);
- The discovery of Avila, someone not related to Ortega, who could have corroborated Louise's and Leticia's testimony that Ortega was present in the family home until at least 12:30 a.m. when Avila left the home, (A.052, A.054);
- The discovery of additional alibi witnesses present in the home who might have been able to testify about Ortega's presence in the family

---

the same way—the suspects either appear sequentially or all at once. (Dkt. 10-20 at 91.) Non-suspects included in lineups and photo arrays are known as "fillers." (Dkt. 10-19 at 228.) Simultaneous lineups have been found to produce a higher, and statistically significant, rate of "filler" identifications than sequential ones. *See generally* Gary L. Wells et al., *A Test of Simultaneous vs. Sequential Lineup Methods*, American Judicature Soc'y (2011), available at https://perma.cc/SH2H-RSUB.

These flaws in procedure make it all the more damning that, even after attacking the reliability of Howard's and Willis' identification of Ortega, Johnson failed to investigate the very alibi witnesses that would have further corroborated the mistaken identity defense advanced at trial.

home, (A.052, A.054);

- Prompted Johnson to reconsider his strategy of calling Ortega as the only witness in the defense case, (Dkt. 10-20 at 9);

- Brought Johnson to inspect the Ortega home, where he would have learned how small it was and how difficult it would have been for Ortega to leave there after 2:15 a.m. and return undetected without waking his sister and her son, or others in the home, (*see* A.054);

- Allowed Johnson to argue that Ortega never could have travelled from the family home to the scene of the shooting—a distance of about 12 blocks—within the time constraints of the witness testimony, (A.032); and

- Turned up additional witnesses corroborating that Leticia had her baby shower that day, adding to the credibility of Leticia's testimony.

Johnson neither discovered nor investigated any of this. Despite his obligation "'to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case,'" *Campbell*, 780 F.3d at 765 (quoting *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009)), Johnson failed to conduct the required investigation. That was unreasonable on its face. And yet the First District failed to apply *Strickland* to evaluate the failure to investigate, which predated any failure to call alibi witnesses at trial.

*Campbell* is directly on point. In *Campbell,* the State relied on eyewitnesses, and presented no physical evidence linking the defendant to the crime. *Id.* at 756. Yet the state appellate court (also on second stage post-conviction review) deemed trial counsel's failure to call (or interview) two alibi witnesses reasonable because counsel's chosen defense was that the scene of the crime was too dark to make "reliable identifications." *Id.* at 761, 763. But the "fundamental problem" with the

state appellate court's analysis—and what made it "unreasonable" for this Court—was "that it ignored counsel's duty to perform a reasonable pretrial investigation *before* committing to a trial strategy." *Id.* at 763. Further, the "obvious exculpatory value of both [witness] accounts appear[ed] on the face of the [affidavits], which were disclosed to counsel before trial." *Id.* at 765. After being put on notice of the potential alibi witnesses, interviewing them would not "have been fruitless or harmful." *Id.* That failure prejudiced Campbell, and this Court found § 2254 satisfied. *Id.* at 772.

Ortega's case tracks *Campbell.* Trial counsel in *Campbell* chose a trial strategy of misidentification, just as Johnson did. In both cases, trial counsel erred by failing to investigate witnesses who would have *bolstered* that very defense. "If trial counsel's investigation of a potential alibi defense was unreasonably limited, then trial counsel's decision not to present an alibi defense is too ill-informed to be considered reasonable." *Id.* at 774 (quoting *Stitts*, 713 F.3d at 891); *see also Mosley*, 689 F.3d at 848; *Blackmon*, 823 F.3d at 1104–05.

The District Court's review of the First District's decision, which this Court reviews *de novo* here, failed to analyze these issues or comprehensively inspect these cases. Instead, the District Court made two fundamental errors when it concluded that (1) an adequate investigation occurred when Louise had a hallway conversation with Johnson before a pretrial conference at the 26th and California courthouse, and (2) Johnson was somehow excused from conducting any investigation at all because family members were involved. (SA.016–019.) Neither conclusion is correct.

First, the pretrial hallway conversation was not an investigation and even the

District Court concedes this. (*See* SA.018 (Johnson "may not have 'investigated' the alibi evidence in the sense that he neither contacted nor employed an investigator to do so.").) What this conversation actually signified was notice—and the District Court seems to concede this point as well. Indeed, the District Court actually seeks to excuse Johnson's failure to investigate by asserting that the "relevant substance" of the alibi evidence was provided to counsel during this conversation with Louise,[15] rendering "additional investigation . . . pointless." (SA.018.) But notice is not investigation under *Campbell* nor does it satisfy *Strickland*.

Far from it. Even if Johnson thought in good faith that Louise's testimony was potentially weak because she was a family member, he had a duty to follow up on that testimony. Had he done so, his investigation would have revealed that there was far more gold to have been mined here. Just as in *Raygoza*, "this was not a case where only the mother was willing to vouch for a defendant's alibi." 474 F.3d at 963. "To the contrary, witnesses both related [Louise and Leticia, and possibly Ortega's other siblings], and unrelated to [Ortega, including at least Avila] could have been called." *Id.* "A consistent story from all of them would have forced the trier of fact to confront the possibility that [Ortega] had been mistaken for another young Hispanic male . . . ." *Id.*; *see also Campbell*, 780 F.3d at 764–65 (finding deficient performance when counsel knew of the alibi witnesses but failed to investigate further); *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("In assessing the reasonableness of an attorney's

[15] The District Court also highlighted that Johnson was on notice of Louise's testimony "months before trial," and counts that as a point in Johnson's favor. (SA.017–018.) That is illogical and actually proves the opposite. Because Johnson learned of Louise's potential alibi "months before trial," he had ample time to investigate. But he did nothing.

investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). Moreover, these affidavits (and the "substance" of the hallway conversation) do not represent the entirety of Louise and Leticia's potential testimony—it is "unlikely" that "if called at trial, they would have parroted their affidavits and refused to say another word." *Lee v. Kink*, 922 F.3d 772, 774 (7th Cir. 2019).

Second, no court, neither the First District nor the District Court, was entitled to conclude that Louise and Leticia's familial status excused Johnson from conducting a real investigation. As this Court explained in *Brady v. Pfister*, "[w]itnesses with ties of family or friendship to a defendant are a common feature in criminal cases, and those witnesses are often privy to details that influence the outcome in the case." 711 F.3d 818, 824 (7th Cir. 2013); *see also id.* ("Indeed, the law does not demand, or even permit, the disregarding of their testimony just because they are close to the accused."). Regardless of their familial status, Louise and Leticia's testimony, even without more, "would have completely contradicted the prosecution's versions of the facts." *Campbell*, 780 F.3d at 766. And again, one alibi witness may lead to another. "In a first-degree murder trial, it is almost impossible to see why a lawyer would not at least have investigated the alibi witnesses more thoroughly." *Raygoza*, 474 F.3d at 964. The stakes could not be higher, yet Johnson failed entirely.

Finally, when the District Court limited its focus to the hallway conversation, and Louise and Leticia's familial ties to Ortega, it ignored everything else a

reasonable investigation could have unearthed. Johnson never had a single conversation with Leticia. That lack of conversation alone demonstrates the lack of a real investigation. Johnson's dismissal of Louise, and his complete failure to interview or investigate Leticia, Avila, or anyone else, constituted deficient performance under *Strickland* and its progeny in this first degree murder case.

### B. The First District's decision that trial counsel's performance "was not constitutionally deficient" was objectively unreasonable under *Strickland*

Under AEDPA, merely establishing that trial counsel's performance was deficient is not sufficient to warrant relief—but Ortega meets the heightened burden he bears under AEDPA.

Because Ortega attacks his conviction collaterally, AEDPA requires he prove "the state court reached a decision that was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court." *Raygoza*, 474 F.3d at 963 (citing 28 U.S.C. § 2254(d)(1) and *Williams*, 529 U.S. at 404–06). The inquiry must determine "whether the state court's application of clearly established federal law was objectively reasonable." *Id.* (quoting *Williams*, 529 U.S. at 409). Here that burden of demonstrating an objectively unreasonable application of federal law is met.

The First District correctly cited *Strickland* as the controlling standard, but then promptly misapplied it. It spent just two paragraphs analyzing the question of whether trial counsel's performance was deficient—and in so doing, committed two errors which render its decision unreasonable. The initial paragraph explained that

decisions whether to call witnesses to testify at trial are matters of "trial strategy." (A.007, ¶ 20.) It stated:

> In this case, the record shows trial counsel was aware of the potential alibi testimony and <u>**decided not to call**</u> defendant's mother and sister as witnesses in light of defendant's testimony that he could not recall his whereabouts on the night the offense occurred. Defendant never personally supplied an alibi of his own and, when questioned at trial, he expressly denied any knowledge of where he was at the time of the murder. As a result, trial counsel asserted during closing argument that if defendant knew where he was when the offense was committed, or if he wanted to fabricate an alibi, he had every opportunity to do so, but did not, in order to appear more credible to the jury. Thus, trial counsel likely **chose not to call[l] Louise and Leticia to testify regarding the alibi as matter of trial strategy,** which does not support an ineffective-assistance-of-counsel claim. *Patterson*, 217 Ill. 2d at 442. **Furthermore, Illinois courts have long recognized that it is a reasonable trial strategy for counsel to forego presenting the testimony of family members because it would be afforded little weight. See *People v. Flores*, 128 Ill. 2d 66, 106–07 (1989)** (defense counsel not ineffective for failing to call potential alibi witnesses where they were related to defendant and counsel reasonably could have concluded that their testimony was unreliable). Accordingly, trial counsel's performance in this respect was not constitutionally deficient.

(A.008, ¶ 21 (emphasis added).) The First District (1) misunderstood the relevant inquiry; and (2) improperly diminished the value of family member testimony, while also ignoring the presence of non-family alibi witnesses. The First District skipped a key step by evaluating the failure to call witnesses rather than the failure to properly investigate alibi witnesses. This misstep is most readily apparent in the First District's total failure to analyze Johnson's failure to investigate Leticia in any manner whatsoever.

First, while not *calling* Louise and Leticia could have been a strategic choice, that decision was fatally infected by the prior and critical failure not *to investigate*

the circumstances of their testimony. It is this failure to investigate that is to be assessed for deficient performance, but the First District failed to do that. And as this Court has held, the decision not to investigate known alibi witnesses is unreasonable; stopping after becoming "aware" is not enough. *See* Argument I.A.1, *supra*. The First District ignored the critical issue—the lack of an investigation itself—and thus never concluded (nor could it have) that trial counsel actually conducted any investigation into the existence of alibi witnesses.

The First District accepted Johnson's decision as "strategy" because the testimony of the alibi witnesses and Ortega's testimony were not in lockstep—Ortega testified that he did not remember his whereabouts on the night of the shooting, whereas Louise and Leticia did. (A.008.) But characterizing Johnson's decision as a strategy to avoid a potential testimony inconsistency lacks any logic.

First, as Judge Kennelly noted below, Ortega's testimony is "not in the least bit inconsistent with the proposed alibi witness accounts." (*See* SA.039.) Two things can be true at the same time: Louise and Leticia could have both recalled where Ortega was at the time of the shooting, while Ortega did not. Second, and even more importantly, the First District's assumed "inconsistency" in testimony never had to have been made known to the jury. Had Johnson conducted the alibi investigation and made the decision to call Louise and Leticia and Avila to the stand, there would have been no reason to call Ortega as a witness at all, thus obviating any testimonial inconsistency in front of the jury. Johnson does not—and cannot—receive the cover of having made a strategy decision to avoid a potential "inconsistency" when he failed

to investigate the facts that would have allowed him to avoid that "inconsistency" in the first place.

Judge Kennelly analyzed the First District's initial error correctly: "[C]alling something a strategic decision does not relieve counsel of his duty to conduct a reasonable investigation or to make a reasonable decision, based on the circumstances of the case, that such an investigation is not necessary." (SA.036 (citing *Strickland*, 466 U.S. at 690–91).) Indeed, *Strickland* explains that strategy only merits deference if preceded by an adequate investigation: "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91; *see also Wiggins*, 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to [trial] strategy."). Illinois courts agree. (SA.036–037); *People v. Flores*, 128 Ill. 2d 66, 105 (1989) (suggesting that if the "failure to call the witnesses was the result of failure to investigate, neglect, or incompetence" it would violate *Strickland*).

The First District also committed another error. Citing *Flores,* it noted that "it is a reasonable trial strategy for counsel to forego presenting the testimony of family members because it would be afforded little weight." (A.008, ¶ 21 (citing *Flores*, 128 Ill. 2d at 106–07).) But *Flores* does not permit defense counsel to decline to call family alibi witnesses without even investigating the scope or detail of their potential testimony because that would violate *Strickland*. *Flores*, 128 Ill. 2d at 105. This Court has consistently held that state courts applied *Strickland* unreasonably when

trial counsel dismissed potential alibi testimony without an investigation, even when the potential alibi witnesses were family members. *See*, *e.g.*, *Brady*, 711 F.3d at 824 ("Indeed, the law does not demand, or even permit, the disregarding of their testimony just because they are close to the accused."); *Blackmon*, 823 F.3d at 1104 ("[A]n outright failure to investigate witnesses . . . is more likely to be a sign of deficient performance." (quotation marks and citation omitted)); *Raygoza*, 474 F.3d at 964; *Stitts*, 713 F.3d at 891–92; (*see also* SA.034–038 (discussing these cases).)

Because the First District assessed only Johnson's strategic decision not to *call* Louise and Leticia as witnesses, but failed to grapple with the foundational decision not to *investigate* Louise after being put on notice of her testimony, or ever speak to Leticia (let alone Avila or the brothers) after being put on notice of their potentially exculpatory testimony, its analysis of *Strickland*'s deficient performance prong was objectively unreasonable. The fact that Louise and Leticia were family members does not alter Johnson's duty to investigate them and their potential testimony.

The lack of any investigation was—without more—objectively unreasonable. Ortega has carried his burden under AEDPA.

## II. Ortega was prejudiced by trial counsel's failure to investigate the alibi witnesses—had counsel done so, there is a reasonable probability the outcome of the trial would have been different

The second *Strickland* prong tests whether there is a "reasonable probability" that counsel's deficient performance prejudiced his defense in a way likely to have led to a different outcome at trial. *Stitts*, 713 F.3d at 891 (citing *Strickland*, 466 U.S. at 687). Ortega must show "'there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.'" *Blackmon*, 823 F.3d at 1105 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.'" *Mosley*, 689 F.3d at 851 (quoting *Strickland*, 466 U.S. at 694).

This Court has found that the prejudice prong of § 2254(d) does not require Ortega to prove that "but for counsel's shortcomings, the outcome of the proceeding *would have been* different." *Mosley*, 689 F.3d at 850–52 (emphasis added) (rejecting the "would have been different" formulation and finding prejudice prong satisfied); *Jones v. Calloway*, 842 F.3d 454, 465 (7th Cir. 2016). Instead, he must merely show a "reasonable probability" that "a jury would have reasonable doubt . . . and therefore acquit." *Stitts*, 713 F.3d at 894. The likelihood of the "reasonable probability" must be "substantial." *Campbell*, 780 F.3d at 769.

## A. Trial counsel's failure to investigate alibi witnesses prejudiced Ortega

When counsel fails to investigate alibi witnesses, he not only fails to learn the nuts and bolts of their testimony, but he also fails to learn ways to attack the prosecution's case, or how existing testimony could be bolstered, discredited, or deemed unhelpful. This investigatory failure necessarily prejudiced Ortega because his defense at trial was stripped of any affirmative testimony establishing that he was 12 blocks away from the scene of the murder when it occurred.

### 1. The complete failure to investigate alibi witnesses necessarily prejudices a defendant

This Court has consistently held that the failure to investigate alibi witnesses prejudices criminal defendants. *Stitts is* instructive, as the prosecution's case there,

as here, rested entirely on two witnesses' testimony. 713 F.3d at 894. Like here, no alibi witnesses took the stand, causing the Court to observe that had the uninvestigated alibi witnesses actually testified, "the trial would have been transformed from a one-sided presentation of the prosecution's case into a battle between competing eyewitness testimony, where there would have been a 'reasonable probability' that a jury would have reasonable doubt as to Stitts's guilt and therefore acquit." *Id.* (quoting *Harrington v. Richter*, 526 U.S. 86, 104 (2011) and compiling additional cases). For *Stitts*, this failure established prejudice, and resulted in an unreasonable application of *Strickland*. *Id.* at 897. Indeed, Ortega's case presents an even more compelling case than *Stitts* because *Stitts* included at least the semblance of an investigation—counsel actually did interview one of the alibi witnesses the day before trial, but even that was considered insufficient. *Id.* at 889, 894.

Similarly, in *Raygoza*, this Court found prejudice based on a failure to investigate (and call) alibi witnesses, underscoring the significance of such a failure. 474 F.3d at 965. "Obviously, a trier of fact approaching the case with fresh eyes might choose to believe the eyewitnesses and to reject the alibi evidence, but this trier of fact never had the chance to do so." *Id.* "This undermines our confidence in the outcome of the proceedings so seriously that we conclude that there is a reasonable probability that the result would have been different had Raygoza's attorney presented the testimony of all or most of his alibi witnesses." *Id.*[16]

*Blackmon* is also instructive. 823 F.3d at 1106. Like here, defendant was

[16] The evidence against Raygoza consisted of "eyewitness identification from [three] rival gang members." *Id.* at 965.

convicted on the testimony of two eyewitnesses who were both strangers to him, "increasing the danger of mistake." *Id.* (citing case and articles discussing issues with eyewitness identifications). "Given . . . the complete lack of any motive, the dearth of physical evidence, and the heavy reliance on the eyewitness identifications of two strangers who saw the killer [briefly]," alibi witnesses created the probability of a different result at trial. *Id.* at 1107. This was true even though none of the alibi witnesses could testify that they saw defendant at the exact time of the shooting, and all were "vulnerable to attacks on their memory at this point." *Id.* at 1106–07. Because the defense would have been "bolstered by several additional eyewitnesses," defendant established prejudice. *Id.*; *see also Mosley*, 689 F.3d at 851 ("[I]f the [alibi witness affidavits] are taken at face value, Mosley was prejudiced by his counsel's failure to call the two witnesses."); *Campbell*, 780 F.3d at 769–72 (analyzing prejudice similarly).

The failure to investigate alibi witnesses prejudices a defendant, especially when the evidence against them is entirely based on eyewitness testimony.

#### 2. There is a reasonable probability that the outcome of Ortega's trial would have been different had Johnson actually investigated the alibi witnesses

The State's case boiled down to two eyewitnesses, Howard and Willis, (Dkt. 10-19 at 7–151; SA.020), with no other evidence whatsoever to corroborate their testimony. This Court has repeatedly affirmed that in cases without corroboration of the State's eyewitnesses, the failure to investigate and present countervailing alibi testimony has a greater impact. *See*, *e.g.*, *Campbell*, 780 F.3d at 770 ("No physical

evidence linked [the defendant] to the crime, so the testimony of the State's eyewitnesses was the most important evidence in the trial.").

Here there was ample reason to call the integrity of the State's eyewitnesses' testimony into question. Johnson elicited some testimony from Howard and Willis that: (1) they had both been drinking at the party, (Dkt. 10-19 at 53–54, 150–51); (2) Willis had been a Four Corner Hustler gang member, (*Id.* at 107); and (3) the witnesses' descriptions of the shooter and minutes leading up the crime were at times inconsistent, (SA.027; Dkt. 10-19 at 62–89, 113, 131–51). Despite his choice to attack Howard and Willis, Johnson proffered *zero* testimony or evidence establishing alternative proof of Ortega's location that night.

"Because defense counsel did not . . . present any other evidence, . . . the jury never heard an alternative version of the facts." *Campbell*, 780 F.3d at 770. When assessing prejudice, this Court must "compare the actual trial to a hypothetical trial in which, based on the facts we must assume are true," at least two alibi witnesses "would have testified to a very different account" of Ortega's whereabouts that evening, which caused prejudice. *Id.*; *see also Mosley*, 689 F.3d at 851.

Because he failed to conduct any investigation, Johnson left critical evidence on the table. Had he investigated, he would have entered trial armed with affirmative evidence to counter Howard and Willis. The existence of this affirmative evidence that was never presented creates "'a probability sufficient to undermine confidence in the outcome.'" *Mosley*, 689 F.3d at 851 (quoting *Strickland*, 466 U.S. at 694). If investigated and used, this affirmative evidence would have "transformed

[the trial] from a one-sided presentation of the prosecution's case into a battle between competing eyewitness testimony[.]" *Stitts*, 713 F.3d at 894; *Blackmon*, 823 F.3d at 1106–07. The lack of investigation robbed Ortega of *any* alibi trial strategy; a strategy that, if deployed, was reasonably likely to have altered the outcome of his trial.

**B. The First District's prejudice analysis was flawed and objectively unreasonable**

Ortega must also show that the First District's analysis of the prejudice prong was objectively unreasonable. *See Raygoza*, 474 F.3d at 963 (citations omitted). The First District spent two paragraphs analyzing the prejudice prong. It said:

> Moreover, defendant has failed to make a substantial showing that trial counsel's failure to investigate or present the alibi defense prejudiced him. Defendant characterizes the evidence presented at trial as "closely balanced," but **this court previously found the State presented "a strong case" against him**. See *People v. Ortega*, No. 1–05–0110 (Feb. 7, 2007) [A.040]. Two eyewitnesses, Jeremy Howard and Mar[l]in Willis, testified that they saw defendant's face as he initially approached and again saw his face when he stood in front of Lawson's van. Both testified that they observed defendant remove a revolver from his waistband, raise the gun, and shoot Lawson. After the shooting, Howard identified defendant in a photo array and in a line-up. Willis identified defendant in a photo array. At trial, Howard and Willis identified defendant in open court.
>
> The testimony of a single witness, if it is positive and the witness credible, is **sufficient to sustain a conviction**. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). **Here, defendant cannot meet the prejudice prong of *Strickland* because the proposed testimony of his mother and sister would have been afforded little weight**. See *Flores*, 128 Ill. 2d at 106–07. Defendant has not demonstrated how the proposed testimony would outweigh the testimony of the two State's witnesses, who had an unobstructed view of defendant and witnessed the offense at close proximity in a well-lit area. In short, defendant has not demonstrated that the investigation and presentation of the alibi defense **would have resulted in a different outcome at trial**. As such, defendant cannot show that he suffered prejudice by the absence of their testimony.

(A.008–009, ¶ 22–23 (emphasis added).)

Unpacking the decision of the First District reveals that it made three errors that make its conclusion of no prejudice objectively unreasonable. First, the First District analyzed Ortega's claim under the incorrect legal standard. Second, it inappropriately characterized the evidence against Ortega as "strong." Third, it concluded that a jury would have "afforded little weight" to the testimony of Louise and Leticia solely because of their familial status, and ignored the verifiable facts in their testimony, as well as the testimony of non-family members (such as Avila) who would have been uncovered if an investigation had occurred.

#### 1. The First District employed the wrong legal standard

Judge Kennelly identified this first error in his opinion below. (*See* SA.039–040 ("But instead of applying *Strickland*'s prejudice standard, the Illinois appellate court appears to have relied on case law applying the sufficiency of the evidence standard[.]").) Rather than applying *Strickland*'s prejudice standard, the First District relied on *People v. Smith* to support the principle that the testimony of just a single eyewitness is "sufficient" to sustain a conviction. (A.009, ¶ 23 (citing 185 Ill. 2d at 541 (applying a sufficiency of the evidence standard when analyzing a challenge to a conviction on direct appeal)).) The First District then found that Ortega failed to show that an investigation "would have resulted in a different outcome at trial." (A.009, ¶ 23.) It misstated Ortega's burden and applied the wrong standard.

Although one witness, without more, can overcome a sufficiency of the evidence challenge on direct appeal, that is not relevant to the *Strickland* prejudice test on

post-conviction appeal. The *Strickland* question is not "did the State present enough evidence to support a finding of guilt"? Instead, the proper question is "had Johnson investigated the alibi witnesses and followed up on what he would have learned, is there a reasonable probability that at least one juror would 'possess a reasonable doubt'"? *See Dunn v. Neal*, 44 F.4th 696, 704 (7th Cir. 2022).

The First District then compounded its error by requiring Ortega to show that but for the deficient performance, the outcome at trial "would have" been "different." (A.009.) Again, this misstates Ortega's burden. The test is not whether the outcome 'would have been different'—it is whether there *is a reasonable probability* that the outcome would have been different. That qualifier matters. *See Mosley*, 689 F.3d at 849 ("The problem is that the state court . . . misstated the controlling constitutional standard under *Strickland*" by requiring petitioner show the result "*would have differed* but for" the deficient performance (emphasis in original)).

The First District stacked the deck against Ortega by imposing an inappropriately high burden on him while also lowering the State's bar. The no prejudice finding was objectively unreasonable.

### 2. The First District mischaracterized the evidence against Ortega as "strong"

The First District then erred by characterizing the evidence against Ortega as "strong." The State's case, while possibly sufficient to support a conviction in the face of an insufficiency of the evidence claim, could never be characterized as "strong." (A.009, ¶ 23 (citing A.040 (First District's decision on direct appeal)).) As explained above, one eyewitness had gang affiliations that compromised his reliability; timing

and travel gaps were unexplored and unexplained; the eyewitnesses had been drinking; it was late at night; and zero physical evidence linked Ortega to the crime. The State's case may have been sufficient, but it was not "strong." *See Blackmon*, 823 F.3d at 1106–07 (coming to a similar conclusion); *Raygoza*, 474 F.3d at 965 (same).

The evidence had gaping holes and Johnson's lack of investigation made trial a "one-sided presentation of the prosecution's case" that would have been "transformed" "into a battle" if Louise and Leticia had been properly investigated. *Stitts*, 713 F.3d at 894; *Campbell*, 780 F.3d at 770 (finding prejudice in part because "[e]ach witness's account would have . . . contradicted the State's versions of the facts.").

#### 3. The First District erred when it reflexively discounted family member testimony as automatically not credible

Finally, the First District erred when it reflexively dismissed any beneficial impact that the family alibi witnesses could have had on Ortega's defense. (A.009, ¶ 23 (citing *Flores*, 128 Ill. 2d at 106–07) (finding Louise and Leticia's testimony "would have been afforded little weight").)[17] But the First District "pointed to nothing in the record that would support the assumption that the trial court would not have credited the witnesses' testimony solely because of their association with" Ortega. *Brady*, 711 F.3d at 824.

This Court has previously rejected the very approach taken by the First District. *See Brady*, 711 F.3d at 824 (explaining how friends and family are a

[17] This error is further compounded by the assumption that the only available witnesses would have been these "flawed" family witnesses. Had even a modicum of an investigation occurred, a non-family witness would have been quickly unearthed.

"common feature" in criminal cases and "are often privy to details that influence the outcome of a case," dismissing them based on this status is "deeply problematic"); *id.* ("Indeed, the law does not demand, or even permit, the disregarding of [family] testimony just because they are close to the accused."); *Raygoza*, 474 F.3d at 965 (finding counsel's failure to call alibi witnesses, including family members, both deficient and prejudicial).

The First District's prejudice ruling was rife with errors. These, plus the serious impact the alibi witnesses would have had at trial, make the First District's prejudice ruling objectively unreasonable.

## III. Ortega is entitled to relief under § 2254 and this Court must decide the proper remedy

Ortega satisfies the requirements of § 2254(d)(1). The record shows that the First District's adjudication of his ineffective assistance of counsel claim "resulted in a decision that . . . involved an unreasonable application of [ ] clearly established Federal law" and that there is a reasonable probability that prejudice ensued. *Id.*

This Court must now determine the proper remedy. The Court has two options available: (1) it can grant a conditional writ of habeas corpus based on the unrebutted record before it, or (2) it can remand the matter to the District Court for an evidentiary hearing.

### A. The Court should grant a conditional writ of habeas corpus now

Ortega has presented ample evidence that at least two, and as many as five, alibi witnesses could have, and should have, been investigated and interviewed in preparation for trial. That never occurred. Louise and Leticia's detailed affidavits

are unrebutted by the State. These two affidavits demonstrate that Johnson failed to investigate, and that this failure prevented Johnson from making fully informed decisions about how to present Ortega's defense to the jury. Indeed, this Court's ruling in granting the certificate of appealability asks the ultimate question—"whether Ortega's trial counsel was ineffective for not investigating potential alibi witnesses." (App. Dkt. 18.)

The answer to the Court's question is yes. On the record before this Court, the conclusion is inescapable that Ortega's constitutional right to effective assistance of counsel was abrogated and that he was prejudiced by that failure. The evidence before this Court that no investigation ever occurred is complete, clear, unrebutted, and damning. Ortega has satisfied the requirements of both § 2254(d)(1) and § 2254(a)—the state court unreasonably applied *Strickland* and he is "in custody in violation of the Constitution . . . of the United States."

This Court can and should grant Ortega a conditional writ of habeas corpus directing the State to inform the District Court whether it intends to retry Ortega or release him.

**B. Alternatively, the Court should order an expedited evidentiary hearing**

If this Court were to conclude that the record requires further factual development, it should remand this case to the District Court for a prompt evidentiary hearing that would specifically focus on resolving any unanswered questions about Johnson's failure to investigate the alibi witnesses.

Should this Court deem an evidentiary hearing necessary, Ortega requests that it be scheduled, and decided, expeditiously. In four days, this case "celebrates" its eighth anniversary in the federal courts. None of the delay in this case is attributable to Ortega. Ortega has diligently pursued his rights and deserves prompt adjudication of the serious claims raised in his petition.

## CONCLUSION

Petitioner Michael Ortega has established that the First District's adjudication of his post-conviction claim of ineffective assistance of counsel based on a failure to investigate alibi witnesses "resulted in a decision that . . . involved an unreasonable application of clearly established law." 28 U.S.C. § 2254(d)(1). Furthermore, Ortega has demonstrated that there is a "reasonable probability" that he was prejudiced by this serious error.

Ortega should be granted a conditional writ of habeas corpus. If not, he should be granted a prompt evidentiary hearing.

Dated: May 18, 2026

Respectfully submitted,

**McDermott Will & Schulte LLP**

By: *s/ Jeffrey E. Stone*

Jeffrey E. Stone (IL #6189590)
Daniel R. Campbell (IL #6312473)
Samuel M. Barder (IL #6345365)
444 W. Lake Street, Suite 4000
Chicago, IL 60606
Tel: 312-984-2064
jstone@mcdermottlaw.com
dcampbell@mcdermottlaw.com
sbarder@mcdermottlaw.com

*Attorneys for Petitioner-Appellant Michael Ortega*

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1

This Brief complies with the type-volume limitations of Rule 28.1(e)(1) of the Federal Rules of Appellate Procedure and Circuit Rule 28.1 because, according to the "word count" function of Microsoft Word, the Brief contains 12,778 words, excluding the parts of the Brief exempted from the word count by Rule 32(f) of the Federal Rules of Appellate Procedure.

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32 and Circuit Rule 32, and the type style requirements of Fed. R. App. P. 28.1(e) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2020 in 12-point font and Century type style, with 11-point footnotes and double-space with one-inch margins.

By: *s/ Daniel R. Campbell*

Jeffrey E. Stone (IL #6189590)
Daniel R. Campbell (IL #6312473)
Samuel M. Barder (IL # 6345365)
444 W. Lake Street, Suite 4000
Chicago, IL 60606
Tel: 312-984-2064
jstone@mcdermottlaw.com
dcampbell@mcdermottlaw.com
sbarder@mcdermottlaw.com

*Attorneys for Petitioner-Appellant Michael Ortega*

## CERTIFICATE OF FILING AND SERVICE

I, Daniel R. Campbell, an attorney, certify that on May 18, 2026, I caused the forgoing **Opening Brief of Petitioner-Appellant Michael Ortega** to be electronically filed with the Clerk of the Court of the United States of Appeals for the Seventh Circuit by using this Court's CM/ECF system and thereby served on all counsel of record. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/EFC system.

By: *s/ Daniel R. Campbell*

Jeffrey E. Stone (IL #6189590)
Daniel R. Campbell (IL #6312473)
Samuel M. Barder (IL # 6345365)
444 W. Lake Street, Suite 4000
Chicago, IL 60606
Tel: 312-984-2064
jstone@mcdermottlaw.com
dcampbell@mcdermottlaw.com
sbarder@mcdermottlaw.com

*Attorneys for Petitioner-Appellant Michael Ortega*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rule 30(a) and 30(b) are included in the Short Appendix.

Dated: May 18, 2026

By: *s/ Daniel R. Campbell*

Jeffrey E. Stone (IL #6189590)
Daniel R. Campbell (IL #6312473)
Samuel M. Barder (IL # 6345365)
444 W. Lake Street, Suite 4000
Chicago, IL 60606
Tel: 312-984-2064
jstone@mcdermottlaw.com
dcampbell@mcdermottlaw.com
sbarder@mcdermottlaw.com

*Attorneys for Petitioner-Appellant Michael Ortega*

**No. 22-2929**

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

**Michael Ortega**
Petitioner-Appellant,
v.
**Ryan Woods,**
Plaintiff-Appellee.

Oral Argument Requested

On Appeal from the United States District Court
For the Northern District of Illinois
1:18-cv-03631
*The Honorable John F. Kness, Presiding Judge*

Required Short Appendix

Jeffrey E. Stone (IL #6189590)
Daniel R. Campbell (IL #6312473)
Samuel M. Barder (IL # 6345365)
444 West Lake Street, Ste. 4000
Chicago, Illinois 60606
Telephone: 312-984-2167
jstone@mcdermottlaw.com
dcampbell@mcdermottlaw.com
sbarder@mcdermottlaw.com

*Attorneys for Petitioner-Appellant*
*Michael Ortega*

No. 22-2929

**REQUIRED SHORT APPENDIX**

**Table of Contents**


| | Page |
|---|---|
| Judgment in a Civil Case<br>Case No. 18-cv-3631, Dkt. 52 (N.D. Ill. Sept. 27, 2022) (Kness, J.) | SA.001 |
| Memorandum Opinion and Order<br>Case No. 18-cv-3631, Dkt. 51 (N.D. Ill. Sept. 27, 2022) (Kness, J.) | SA.002 |
| Memorandum Opinion and Order<br>Case No. 18-cv-3631, Dkt. 16 (N.D. Ill. Aug. 9, 2019) (Kennelly, J.) | SA.024 |

ILND 450 (Rev. 04/29/2016) Judgment in a Civil Action

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MICHAEL ORTEGA (R-40675),<br><br>Petitioner,<br><br>v.<br><br>ANTHONY WILLS,<br><br>Respondent. | No. 18-cv-03631<br><br>Judge John F. Kness |

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff

which ☐ includes pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒ In favor of Respondent ANTHONY WILLS and against Petitioner MICHAEL ORTEGA.

---

☐ other:

---

This action was *(check one)*:

☐ tried by a jury with Judge presiding, and the jury has rendered a verdict.
☐ tried by Judge without a jury and the above decision was reached.
☒ decided by Judge John F. Kness on entry of an order denying the Petition for a writ of habeas corpus.

Date: September 27, 2022

JOHN F. KNESS
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL ORTEGA (R-40675), | ) | |
| | ) | |
| Petitioner, | ) | No. 18-cv-03631 |
| | ) | |
| v. | ) | |
| | ) | Judge John F. Kness |
| ANTHONY WILLS, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Michael Ortega, an Illinois prisoner at Menard Correctional Center, filed this habeas corpus action under 28 U.S.C. § 2254 challenging his 2004 Cook County murder conviction. (Dkt. 1.) Before the Court is Petitioner's motion for an evidentiary hearing, by which he seeks to develop evidence concerning his claim of ineffective assistance of trial counsel based on counsel's purported failure to investigate alibi evidence from Petitioner's mother and sister. (Dkt. 28; Dkt. 34; Dkt. 40.) For the reasons that follow, the Court holds that the Illinois court reasonably concluded that Petitioner's trial counsel did not render ineffective assistance. Petitioner is therefore not entitled to habeas relief. And because federal courts are, except in limited circumstances not present here, bound on habeas review to the factual record developed in the state courts, the Court similarly denies Petitioner's motion for an evidentiary hearing.

## I. BACKGROUND

### A. Petitioner's Trial and Direct Appeal

This case relates to Petitioner's first degree murder conviction for the shooting death of Kenneth Lawson in July 2003. (Dkt. 10-1 at 1–4) (*People v. Ortega*, 932 N.E.2d 1221 (Table) (Ill. App. Ct. Feb. 7, 2007)).[1] Petitioner was found guilty following a jury trial, and the state trial court sentenced Petitioner to 46 years of imprisonment.

As established at trial, between 10:30 and 11:00 p.m. on the evening of July 12, 2003, Lawson and his friend Jeremy Howard drove a van to a party on Chicago's south side. (Dkt. 10-1 at 1–2.) Once there, Lawson and Howard met another friend, Marlin Willis. (*Id.*) After driving to a liquor store and returning with a bottle of rum, Lawson parked his van. (*Id.* at 2.) Guests at the party mingled on the house's porch, in the area between the porch and the van, and in the van itself, the sliding door of which was open. (Dkt. 10-19 at 15–16, 104-05). A few hours later, a Hispanic man wearing a bandana walked by the party, threw up a gang sign, and said "Latin Kings" to Lawson. (Dkt. 10-1 at 2.) Lawson and the man argued. Although the argument did not involve physical violence, Howard stepped in to break it up. The man with the bandana then said he would return soon and told Lawson, Howard, and Willis they should not be there when he did. (*Id.*)

[1] This description of the trial evidence is taken from the direct-appeal opinion of the Appellate Court of Illinois (Dkt. 10-1), and from the trial transcript itself where necessary to fill in gaps. (Dkt. 10-18, 10-19, and 10-20.) Because facts recited in a state appellate court opinion are "presumptively correct on habeas review," this Court is entitled to rely upon them. *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1)).

Five minutes later, the man with the bandana returned, accompanied by another man, later identified by Howard and Willis as Petitioner. (Dkt. 10-1 at 2.) At that time, Lawson, Howard, and Willis were preparing to leave in the van. Lawson was in the driver's seat and Howard and Willis were standing by the open sliding door. (*Id.*) Howard and Willis testified that Petitioner and Lawson argued before Lawson exited the van and walked toward Petitioner. (*Id.*) Howard then walked up to Lawson, took Lawson by the arm, and dragged him back into the van. (*Id.*) Howard walked around the van to the sliding door, and Lawson then exited the van again and stated he was walking home. (*Id.* at 2–3.) Petitioner stood in front of the van when Lawson exited it a second time, and the two of them argued as Lawson was walking away. Petitioner then pulled a gun from his gym shorts and fired once at Lawson; after shooting at Lawson, Petitioner ran from the scene. (*Id.*) Lawson collapsed and was later pronounced dead at a hospital. (*Id.* at 3.)

Several weeks later, Howard was shown a photo array and identified Petitioner as the shooter. (*Id.*) On August 5, 2003, Howard viewed a physical lineup of four men that included Petitioner. Howard again identified Petitioner. (*Id.*) Another officer showed Willis a different photo array of six pictures, and Willis too identified Petitioner as the shooter. (*Id.*)

Both officers testified at trial. The officer who showed a photo array to Howard stated that he used a three-year old picture of Petitioner when creating the array, and that information with the photograph specified that Petitioner weighed 145 pounds at the time the photograph was taken. (*Id.*; *see also* Dkt. 10-19 at 202.) In the

photo array prepared for Willis by a different officer, the photograph of Petitioner stated that he weighed 200 pounds. (Dkt. 10-19 at 238, 242.)

Petitioner's defense at trial was that he was not at the scene of the shooting and that Howard and Willis mistakenly identified him. *People v. Ortega*, 2017 IL App (1st) 151326-U, ¶ 4 (Ill. App. Ct. 2017). Petitioner testified that, although he could not affirmatively remember where he was, he remembered where he was not: at or near the shooting. (Dkt. 10-20 at 19–20.) During closing arguments, Petitioner's trial counsel stated that Petitioner's testimony was sincere, that he "had ample opportunity to create an alibi if he wanted to," but that most people cannot remember where they were on a particular evening "unless it is a special day . . . [;] a birthday or a holiday." (*Id.* at 105); *Ortega*, 2017 IL App (1st) 151326-U, ¶ 4. A jury found Petitioner guilty, and he was sentenced to 46 years' imprisonment. (*Id.* ¶ 5.)

On direct appeal, Petitioner argued that the evidence against him was insufficient; his trial counsel was ineffective for failing to call an expert witness about the fallibility of identification testimony; and that the prosecutor engaged in prosecutorial misconduct by calling Petitioner a "liar" and a "thinking criminal" during closing arguments. (Dkt. 10-1 at 4–12.) Rejecting all three claims, the Appellate Court of Illinois (the "Appellate Court") affirmed. (*Id.*) Petitioner filed a petition for leave to appeal in the Supreme Court of Illinois and asserted the same claims, but that court denied the petition. (Dkt. 10-7; Dkt. 10-8.)

### B. Petitioner's Postconviction Proceedings

Petitioner filed a state postconviction action and asserted, among other things, that his trial counsel was ineffective for failing to investigate whether to call Petitioner's mother (Louise Ortega) and sister (Leticia Ortega) as alibi witnesses. (Dkt. 10-21 at 35–140.) Shortly after filing the petition, Petitioner submitted signed affidavits from his mother and sister in which both indirectly stated that Petitioner was at his mother's house on the night of the shooting. (Dkt. 10-22 at 7–11.) The state trial court dismissed that petition in its first stage of review.[2] (Dkt. 10-21 at 141.) But the Appellate Court reversed and remanded for further proceedings. *See Ortega*, 2017 IL App (1st) 151326-U, ¶¶ 8–9. On remand, the trial court appointed counsel for Petitioner; counsel then filed a supplemental petition with new affidavits from Louise and Leticia. (Dkt. 10-23 at 64–67.)

Louise's supplemental affidavit stated that Petitioner was living with her at the time of the shooting. (*Id.* at 64.) Louise remembered that Petitioner was home on the night of the shooting because of an incident involving her daughter Leticia following Leticia's baby shower. When Louise and her then-boyfriend Benny Avila

[2] Illinois' post-conviction process provides for three stages of review. 725 ILCS 5/122-1, *et seq*. At the first stage, the state trial court "review[s] the postconviction petition, without input from the State, and determine[s] whether it is 'frivolous or is patently without merit.' " *People v. House*, 2021 IL 125124, ¶ 16 (quoting 725 ILCS § 5/122-2.1(a)(2)). At the second stage, "counsel may be appointed to represent the petitioner . . . the State may file responsive pleadings," and the trial court determines if the petition makes "a substantial showing of a constitutional violation." *Id.* at ¶ 17 (citing 725 ILCS §§ 5/122-4, 122-5). If a petition makes it beyond stage two, the trial court conducts an evidentiary hearing to decide if the petitioner has established a constitutional violation at stage three. *Id.* at ¶ 17 (citing 725 ILCS § 5/122-6).

argued, and Benny tried to hit Louise, Leticia jumped in to protect her mother. Leticia then complained to Petitioner about failing to intervene. (*Id.*)

Louise also explained that she conveyed this information to Petitioner's counsel during a conversation in late 2003 or early 2004, while they were both at the criminal courthouse. (*Id.*) In response, according to Louise, counsel neither asked Louise any questions nor requested to speak with her daughter. Nor did counsel use an investigator or consult with Louise about using one. (*Id.* at 64–65.) Instead, Louise recalls, counsel "said the only thing that would help was if I had some receipt that would prove where my son . . . was." (*Id.* at 64.)

Leticia's supplemental affidavit similarly recalls her baby shower on July 12, 2003. Leticia remembered that she and her young son spent the night at her mother's house, and that Avila was there until he and Louise argued and then he left. (*Id.* at 66–67.) According to Leticia, she and her mother stayed up talking until 2:00 a.m., when Leticia asked Petitioner to move from the couch to a loveseat so Leticia could sleep. Petitioner moved to the loveseat and was still there when she awoke later that morning. (*Id.*) Both Louise and Leticia stated they would have been willing to testify at Petitioner's trial. (*Id.* at 64–65, 67.)

The state trial court denied Petitioner's supplemental postconviction petition at the second stage of review—before the stage that would have included an evidentiary hearing (Dkt. 10-23 at 76–83)—and the Appellate Court affirmed. *Ortega*, 2017 IL App (1st) 151326-U. Both courts determined that Petitioner could not

establish his ineffective assistance of counsel claim. *Id.* at ¶¶ 20-23; (Dkt. 10-23 at 80–83); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Of particular importance here, the Appellate Court[3] determined that trial counsel was aware of the availability of Louise and Leticia's alibi testimony but chose not to call them. *Ortega*, 2017 IL App (1st) 151326-U, ¶ 21. Instead, counsel chose to have Petitioner testify that he could not remember his location on the night of the shooting and to then emphasize Petitioner's candor during closing argument by telling jurors that Petitioner could have created an alibi but chose not to. *Id.* That court held that the decision of trial counsel decision was strategic and noted that "Illinois courts have long recognized that it is a reasonable trial strategy for counsel to forego presenting the testimony of family members." *Id.* (citing *People v. Flores*, 538 N.E.2d 481, 497–98 (Ill. 1989)).

As to *Strickland*'s prejudice prong, the Appellate Court determined that, because the "proposed testimony of [Petitioner's] mother and sister would have been afforded little weight," Petitioner "ha[d] not demonstrated how the proposed testimony would outweigh the testimony of the two State's witnesses, who had an unobstructed view of defendant and witnessed the offense at close proximity in a well-lit area." *Id.* at ¶ 23. Petitioner presented his ineffective assistance claim to the Supreme Court of Illinois, but the court denied leave to appeal. (Dkt. 10-15; Dkt. 10-16.)

[3] This Court's discussion focuses on the state appellate decision since federal courts "look to . . . the 'last reasoned state–court decision" addressing the claim on the merits. *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (quoting *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013)).

### C. Petitioner's Section 2254 Petition

Following the conclusion of proceedings in the Illinois courts, Petitioner, acting *pro se*, filed the present petition under 28 U.S.C. § 2254. (Dkt. 1.) Petitioner asserted four claims: (1) the trial evidence was insufficient to support his conviction; (2) trial counsel was ineffective for failing to call an expert witness to testify about the unreliability of eye-witness testimony; (3) trial counsel was ineffective for failing to investigate and call Petitioner's mother and sister as alibi witnesses; and (4) the prosecutor made inappropriate, inflammatory remarks during closing argument. (*Id.*) This case initially was assigned to another judge in this District, who denied Claims One, Two, and Four in a written opinion. (Dkt. 16.)

As to Claim Three (the only remaining claim), the Court's earlier opinion questioned the reasonableness of the Appellate Court's decision, which rested, in part, on the premise that it is not unreasonable for an attorney to forego using testimony from family members "because it would be afforded little weight." (Dkt. 16 at 13). As the Court explained (by the previously assigned judge), the Appellate Court never found that Petitioner's trial counsel "actually investigated the alibi witnesses," and the Court noted that the Seventh Circuit has criticized state courts for relying on a presumption that alibi testimony from close family members is so inherently weak that defense counsel need not investigate it. (Dkt. 16 at 14–15.)

But the Court's earlier opinion left open whether the Appellate Court's decision was an unreasonable application of *Strickland* or an unreasonable determination of facts. *See* 28 U.S.C. § 2254(d). Instead, the Court held that the "ineffective assistance

of counsel claim should not be denied outright" and thus appointed counsel for Petitioner "to explore the validity of [the] claim, as well as whether an evidentiary hearing should be held." (Dkt. 16 at 17.) Appointed counsel then filed the pending motion for seeking an evidentiary hearing. (Dkt. 17; Dkt. 28.)

## II. DISCUSSION

### A. Before Determining if an Evidentiary Hearing Should Be Held, This Court Must Decide if Petitioner Satisfies 28 U.S.C. § 2254(d).

Petitioner's motion for an evidentiary hearing begins by arguing that he meets both the statutory and judicially created requirements for such a hearing. (Dkt. 28 at 10–12.) Petitioner then contends that 28 U.S.C. § 2254(d) does not prevent federal habeas relief in this case. (*Id.* at 12–21.) But Petitioner's approach—considering whether to allow an evidentiary hearing and then addressing whether Section 2254(d) prevents federal habeas relief—pays insufficient heed to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, the Court must first address whether the state court's denial of Petitioner's ineffective assistance claim was unreasonable under Section 2254(d). Only if the Court makes such a finding can it then decide whether to hold an evidentiary hearing.

Under Section 2254(d), when a state court decides the merits of the constitutional claim being asserted in a Section 2254 petition, relief is unavailable unless the state court decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) was based on an unreasonable determination of facts in the light of the state court record. 28 U.S.C. §§ 2254(d)(1),

(2). A federal court cannot consider new evidence not presented to the state court when conducting its Section 2254(d) analysis: as the Supreme Court recently reiterated, AEDPA "restricts the ability of a federal habeas court to develop and consider new evidence." *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). Review "of factual determinations under Section 2254(d)(2) is expressly limited to 'the evidence presented in the State court proceeding,' " and "review of legal claims under §2254(d)(1) is also limited to the record that was before the state court." *Id.* at 2043–44.

Because the Appellate Court addressed the merits of Petitioner's ineffective assistance of counsel claim, federal habeas relief is unavailable if the state court's decision was reasonable. When determining reasonableness, this Court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181–82; *see also Westray v. Brookhart*, 36 F.4th 737, 754 (7th Cir. 2022) ("no federal evidentiary hearing is permitted when the state court has already addressed the issue," and that court's adjudication was reasonable under Section 2254(d)).

It is true that state courts may not "insulate their decisions from federal review by refusing to entertain vital evidence." *Lee v. Kink*, 922 F.3d 772, 775 (7th Cir. 2019). A state court's "refusal to consider evidence can render its decision unreasonable" for purposes of Section 2254(d). *Id.* But "an evidentiary hearing may be needed" only if

Section 2254(d) does not otherwise bar relief. *Stechauner v. Smith*, 852 F.3d 708, 722 (7th Cir. 2017).[4]

That approach to be taken by a federal court—namely, reviewing the state court's adjudication of a claim under Section 2254(d) before determining whether to accept new evidence—comports with AEDPA's goal of promoting comity, finality, and federalism. *Pinholster*, 563 U.S. at 185; *see Shinn v. Ramirez*, 142 S. Ct. 1718, 1730–31 (2022).[5]

Because the state courts decided the merits of the ineffective assistance claim, the Court must first determine whether Section 2254(d) prevents federal habeas relief before deciding whether to conduct an evidentiary hearing to receive additional evidence not presented to the state court.

[4] The post-AEDPA structure of Section 2254 itself sets out the path a state prisoner must follow to obtaining federal habeas relief. First, he must fully and fairly present his constitutional claim to the state courts or show why state court remedies are inadequate. *See* 28 U.S.C. §§ 2254(b), (c). Sections 2254(d) and (e)(1) then provide the review standards binding federal courts when addressing a state court's adjudication of those claims. Only if Section 2254(d) does not bar relief can a state prisoner seek to introduce new evidence under Section 2254(e)(2), which has its own separate requirements.

[5] Petitioner's contention that "a petition for a writ of habeas corpus shall be granted if the state court's adjudication on the merits" was unreasonable under Section 2254(d), *see* Dkt. 28 at 8, is inaccurate. Section 2254(d) is not a means of obtaining federal habeas relief but rather a hurdle. Whether the petitioner is entitled to relief under Section 2254(a) when "he is in custody in violation of the Constitution or laws or treaties of the United States . . . is a separate question" from whether the state court's decision was unreasonable under Section 2254(d). *Mosley*, 689 F.3d at 853. Only when a federal court addresses the merits of the claim under Section 2254(a), as opposed to the reasonableness of the state court's adjudication of the claim under Section 2254(d), may it consider new evidence under Section 2254(e)(2), which has its own set of requirements, mainly that the prisoner attempted to develop the evidence in state court. *Id.*; *see also Lee*, 922 F.3d at 773 ("a federal court may hold an evidentiary hearing if, through no fault of petitioner's, the state-court record lacks essential facts").

**B. Petitioner Cannot Satisfy the Requirements of Section 2254(d).**

*1. Standard of Review*

Relief is not available to habeas petitioners "with respect to any claim that was adjudicated on the merits in a State court proceeding unless" the claim resulted in "a decision that was contrary to" or involved "an unreasonable application of" clearly established federal law or resulted in a decision that was based on an "unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d). This Court applies this standard to the "last reasoned state-court decision" addressing the claim, *Dassey*, 877 F.3d at 302 (quoting *Johnson*, 568 U.S. at 297 n.1), which, in this case, is the Appellate Court's decision affirming the denial of Petitioner's second postconviction appeal. *Ortega*, 2017 IL App (1st) 151326-U.

Neither party argues that the Appellate Court's decision is contrary to clearly established federal law. A state-court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). The appellate court correctly stated the familiar two-prong standard for an ineffective assistance of counsel claim. *Ortega*, 2017 IL App (1st) 151326-U, ¶ 19 (quoting *Strickland*, 466 U.S. at 687-88, 694). Moreover, this Court is not aware of any decision of the Supreme Court based on materially indistinguishable facts that nonetheless arrived at a

different result. Petitioner, therefore, cannot satisfy the "contrary to" standard of Section 2254(d)(1).

To establish that the Appellate Court's decision "involved an unreasonable application of" *Strickland* under Section 2254(d)(1), Petitioner must demonstrate that the decision is not only incorrect but "objectively unreasonable." *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir. 2019) (citing *Wiggins*, 539 U.S. at 520; *Williams*, 529 U.S. at 411). Unreasonable in this context means "lying well outside the boundaries of permissible differences of opinion." *McGhee v. Dittmann*, 794 F.3d 761, 769 (7th Cir. 2015) (citation omitted). That high bar requires a state prisoner to show that the state court's ruling on the claim being presented in federal court is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). With respect to ineffective assistance of counsel claims, so long as the Court is "satisfied that the [state appellate court] took the constitutional standard seriously and produce[d] an answer within the range of defensible positions," it should deny the writ. *Felton*, 926 F.3d at 464; *see Morgan v. Hardy*, 662 F.3d 790, 800–01 (7th Cir. 2011) (To demonstrate an unreasonable determination of facts under Section 2254(d)(2), Petitioner must show that the state appellate court decision ignored "the clear and convincing weight of the evidence.").

Considering Section 2254(d)'s deferential standard, Petitioner could not establish that his trial counsel provided deficient performance or that the absence of the alibi testimony prejudiced his defense. (Dkt. 28 at 8–21). Both *Strickland* prongs

must be established to succeed, and "failing to prove either element defeats [the] claim." *Winfield v. Dorethy*, 956 F.3d 442, 452 (7th Cir. 2020); *Strickland*, 466 U.S. at 694. Based on the present record, the Appellate Court's determination that the performance of Petitioner's counsel did not meet the *Strickland* test was reasonable.

*2. Deficient Performance*

To establish deficient performance, a petitioner "challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' " *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 688). That requires a petitioner to identify errors serious enough to find that counsel failed to function as counsel as guaranteed "by the Sixth Amendment." *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) (cleaned up). Separately, the Court must apply the deferential presumption that strategic judgments made by counsel are reasonable to "avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight." *Dunn*, 981 F.3d at 591 (quoting *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012)).

Strategic choices made after a less-than-complete investigation are reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Decisions such as who to call as witnesses, what objections to make, and which arguments to advance are usually considered strategic choices for counsel. *McCoy v. Louisiana*, 138 S. Ct. 1500, 1509 (2018) (citing *Gonzalez v. United States*, 553 U.S. 242, 249 (2008)); *see Carter v.*

*Duncan*, 819 F.3d 931, 942 (7th Cir. 2016) (a "lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review") (quotation omitted).

Petitioner's challenge to his counsel's decision not to call Louise or Leticia as witnesses relies on the premise that counsel failed to investigate their alibi. Citing portions of Louise and Leticia's affidavits, Petitioner contends that the "evidence presented to both the state trial and appellate court establishes that [counsel] performed no investigation into the alibi defense" but instead "summarily dismissed both alibi witnesses because they were Ortega's mother and sister and leapt to the conclusion that no one would believe them." (Dkt. 28 at 14.)

This Court's earlier decision dismissing most of Petitioner's claims explained that Louise "had never been interviewed by [counsel] (either before or during the trial)" and that she "was only able to get [counsel] to speak to her when she initiated a conversation with him on the day of the trial." (Dkt. 16 at 13.) Even then, counsel "allegedly waved her away and told her he had no reason to talk to her unless she had documentary evidence of Ortega's whereabouts on the night of Lawson's murder." (*Id.*) (citing Dkt. 10-22 at 9).

Upon further review of the record, and with the benefit of the parties' submissions, the Court now finds that the Appellate Court reasonably determined that counsel's decision not to call Louise or Leticia was strategic and, therefore, did not constitute ineffective assistance of counsel. Louise spoke with counsel about Leticia's and her proffered testimony on the morning of trial, to be sure, but that was not the first time counsel was presented with the proposed evidence. In her

supplemental affidavit, obtained after the Appellate Court remanded Petitioner's postconviction petition for further proceedings, Louise stated that she had two conversations with counsel. (Dkt. 10-23 at 64–65.) Louise first spoke with counsel in late 2003 or early 2004 (months before the trial in November 2004), and again on the morning of jury selection. (*Id.*)

In its written opinion, the Appellate Court addressed counsel's conversation with Louise. *Ortega*, 2017 IL App (1st) 151326-U, ¶ 10. After describing the conversation between Louise and counsel and noting that "[t]he decision whether to call particular witnesses is a matter of trial strategy and thus will not ordinarily support an ineffective-assistance-of-counsel claim," the Appellate Court determined that "trial counsel was aware of the potential alibi testimony and decided not to call defendant's mother and sister as witnesses in light of defendant's testimony that he could not recall his whereabouts on the night the offense occurred." *Ortega*, 2017 IL App 1st) 151326-U, ¶¶ 20–21. That decision was, in the Appellate Court's view, strategic for a variety of reasons. Among other things, calling Louise or Letitia would have conflicted with counsel's chosen trial strategy of attempting to maintain credibility with the jury, and the decision not to call family members as alibi witnesses is long-established as a reasonable trial strategy under Illinois law. *Id.* This explanation by the Appellate Court shows that the court considered the trial record and the proffered evidence, as well as relevant Supreme Court of Illinois precedent, before concluding that "trial counsel's performance in this respect was not constitutionally deficient." *Id.* (citing *Flores*, 128 Ill. 2d at 106–07).

Counsel has a duty to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690–91. Petitioner's counsel may not have "investigated" the alibi evidence, in the sense that he neither contacted Louise nor employed an investigator to do so. But the relevant substance was provided to counsel months before trial when Louise summarized her daughter's and her alibi evidence "in great detail." (Dkt. 10-13 at 9). Counsel explained to Louise that, without corroborating evidence, the alibi testimony of close family members would be of limited value. (Dkt. 10-13 at 7). Counsel did inquire into Louise's offer to testify: he asked her if there was anyone besides Louise and Leticia—two family members whose credibility could have hurt Petitioner's case—who could attest to the alibi.

Because only family members were present during the events described by Louise and Leticia, it is unclear what further investigation by counsel could have revealed. Equally important, Petitioner himself did not claim the alibi as his own, thus limiting the usefulness of Louise and Leticia's testimony and suggesting that additional investigation would be pointless.

More broadly, the requirement that counsel conduct a reasonable pre-decision investigation seeks to ensure only that counsel "make[s] an informed decision" before trial. *Blackmon v. Williams*, 823 F.3d 1088, 1103 (7th Cir. 2016) (citing *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005)). Petitioner's construction of the rule, however, would turn the requirement into a tool for grading counsel's performance years after trial and in the abstract. Because such a post-hoc inquisition is neither

required nor supported under governing law, and because further investigation was not necessary for Petitioner's counsel to identify the strategic pros and cons of Louise's proffered testimony, counsel's decision not to call Louise and Leticia was a permissible strategic choice.

More to the point, the Appellate Court's *decision* that counsel was not ineffective, a decision to which AEDPA says this Court owes deference, was not unreasonable in the light of the record showing that Louise explained her daughter's and her potential testimony to Petitioner's counsel months before trial. That decision neither unreasonably applied *Strickland* nor involved an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d). Put another way, the Court finds that there is no possibility "fairminded jurists" could agree that the Appellate Court's decision "conflicts with [the] [Supreme] Court[] precedents" on ineffective assistance of counsel. *Harrington*, 562 U.S. at 102. On the contrary, the Appellate Court, which routinely considers direct appeals of murder convictions and as a result has significant and wide-ranging exposure to the performance of trial counsel in murder cases, took the "constitutional standard seriously and produce[d] an answer within the range of defensible positions." *Felton*, 926 F.3d at 464. Petitioner thus cannot meet the "doubly deferential" standard of Section 2254(d) on the question of his trial counsel's performance. *Harrington*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.") (internal citations omitted).

Petitioner's inability to establish deficient performance, by itself, means that his petition for habeas corpus relief based on the ineffective assistance of counsel must be denied. *See Winfield*, 956 F.3d at 452. As explained below, however, Petitioner also fails to show that the Appellate Court acted unreasonably in concluding that Petitioner could not meet the prejudice requirement under *Strickland*.

*3. Prejudice*

When addressing *Strickland*'s prejudice requirement, a court must consider the evidence that would have been presented at trial "but for counsel's unprofessional error" along with the "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 694–95. The issue is not whether the defendant is innocent or would have been acquitted, "but instead whether he would have had a 'reasonable chance' of acquittal." *Blackmon*, 823 F.3d at 1105 (quoting *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006)). A reasonable probability is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In this case, the Appellate Court, in finding a lack of prejudice, recognized that it had previously found on direct appeal that the State presented "a strong case" against Petitioner given the multiple eyewitnesses. (Dkt. 10-3 at 8). This conclusion, in particular with regard to the identification testimony from eyewitnesses Howard and Willis, is supported by the record. *See generally* (Dkt. 10-19 at 26–152). Both witnesses testified that they saw the shooter while they were near him on a well-lit street. Both identified Petitioner as the shooter at trial and in photo arrays shown to

them by police officers within weeks after the shooting. And at trial, the jury was shown pictures of the street where the shooting occurred. (*Id.*) Based on this record, the state Appellate Court's characterization of the prosecution's case as "strong," *see Ortega*, 2017 IL App (1st) 151326-U, ¶ 22, was reasonable. *See*, *e.g.*, *Woods v. Schwartz*, 589 F.3d 368, 378 (7th Cir. 2009) (holding no prejudice under *Strickland* because "at trial, two eyewitnesses is very strong evidence of guilt").

In contrast to the eyewitness testimony offered at trial, the Appellate Court emphasized the light weight afforded under Illinois law to the proffered testimony of Petitioner's family members. *Ortega*, 2017 IL App (1st) 151326-U, ¶¶ 22–23. Although alibi evidence from a close relative to a defendant cannot be wholly discounted, *see Brady*, 711 F.3d at 824, a court can consider that relationship in assessing the value of purported alibi testimony. *See Raygoza*, 474 F.3d at 963 (trial counsel "may . . . have been correct to conclude that a defendant is in a weak spot if the only alibi witness he can offer is his mother, or perhaps just a mother and a girlfriend"); *see also Stitts*, 713 F.3d at 894 ("[f]or instance, if Stitts's father claimed that Stitts was having a one-on-one dinner with him at the time of the shooting, and trial counsel concluded that the father would make a poor witness, then it could be reasonable to end the alibi investigation at that point").

Although the proffered alibi testimony from Petitioner's mother and sister could not be completely discredited, the Appellate Court did not act unreasonably when it determined that the purported alibi testimony from Petitioner's mother and sister, when weighed against the strong eyewitness testimony offered at trial, would

not have led to a reasonable probability of a different outcome.[6] *Strickland*'s prejudice standard, of course, must include a consideration of the strength or weakness of the prosecution's case at trial. *See Mosley*, 689 F.3d at 850 ("a verdict . . . only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support") (quoting *Strickland*, 466 U.S. at 696); *see also Blackmon*, 823 F.3d at 1106 ("We begin . . . with the weakness of the State's case."); *Smith v. Brown*, 2012 WL 3704976, at *8 (S.D. Ind. Aug. 27, 2012) ("The weight of the evidence is a key consideration in conducting the prejudice inquiry under *Strickland*."). In view of the record developed in the state proceedings, the Court cannot say that the Appellate Court's determination on the prejudice question was contrary to, or amounted to an unreasonable application of, clearly established federal law.

Petitioner can establish neither that the state appellate court's decision was contrary to or involved an unreasonable application of either *Strickland's* deficient performance or prejudice standards. Nor, as the record supports the state court's findings, can he demonstrate that the decision involved an unreasonable

---

[6] Petitioner's motion for an evidentiary hearing also seeks testimony from Avila. (Dkt. 28 at 16.) But Petitioner never argued to the state courts that his trial attorney should have called or investigated Avila as an alibi witness. (*See generally* Dkt. 10.) Nor does the state record reflect that Petitioner attempted to develop evidence with respect to Avila. (*Id.*) Petitioner thus cannot satisfy the requirements of Sections 2254(b) and (e)(2) regarding Avila. But even if the Court could allow Petitioner to develop new about potential alibi evidence from Avila, both Louise and Leticia's initial affidavits reflect that Avila left Louise's house at around 12:30 a.m., about an hour before the shooting. (Dkt. 10-22 at 8, 11.) Witnesses can and do say more than what is in their affidavits, *Lee*, 922 F.3d at 775, but the Supreme Court has made clear that "'[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.' " *Pinholster*, 563 U.S. at 186. Petitioner's speculations about Avila's testimony neither warrant an evidentiary hearing nor cause the Court to alter its analysis.

determination of facts. Because Petitioner cannot satisfy the requirements of Section 2254(d), an evidentiary hearing is neither needed nor appropriate under Section 2254(e)(2). Petitioner's motion for an evidentiary hearing is therefore denied.

### C. Appellate Rights and Certificate of Appealability

If Petitioner seeks to appeal this decision, he must file a notice of appeal in this Court within 30 days of the date final judgment is entered on the Court's docket. In the Court's view, Petitioner cannot make a substantial showing of the denial of a constitutional right, nor can he show that reasonable jurists would debate, much less disagree with, this resolution of his claims. For these reasons, the Court declines to issue a certificate of appealability. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (*citing* 28 U.S.C. § 2253(c)(2)); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## III. CONCLUSION

Petitioner's motion for an evidentiary hearing and petition under Section 2254 are denied. The Clerk of Court is directed to: (1) substitute Anthony Wills, Warden of Menard Correctional Center, as Respondent in place of Jacqueline Lashbrook; and (2) alter the caption of this case to *Ortega v. Wills*. A final judgment order will be entered separately.

SO ORDERED in No. 18-cv-03631.

Date: September 27, 2022

JOHN F. KNESS
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL ORTEGA,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 3631** |
| | ) | |
| **JACQUELINE LASHBROOK, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Michael Ortega was convicted by an Illinois jury of first-degree murder. A Cook County judge sentenced him to forty-six years in prison. Having exhausted direct appeals and state collateral challenges, Ortega has petitioned for a writ of habeas corpus under 28 U.S.C. § 2254. He contends that (1) there was insufficient evidence to sustain his conviction; (2) his trial counsel was ineffective for failing to call an expert witness regarding eyewitness identification; (3) his trial counsel was also ineffective for failing to investigate alibi witnesses; and (4) the prosecution violated his constitutional rights by making certain closing arguments. For the reasons below, the Court overrules all of Ortega's claims but the third. The Court is not prepared to dismiss that claim and instead will appoint counsel to investigate its viability.

**Background**

Michael Ortega was convicted of murdering Kenneth Lawson. The indictment alleged that the killing took place on the evening of July 12, 2003 outside a house on

South Houston Avenue in Chicago. Lawson was attending a party at the house, which belonged to Shirly McBride, with two of his friends, Jeremy Howard and Marlin Willis. Howard and Willis each testified to the events of that evening. According to Howard and Willis, the three men met up at a gas station nearby and drove Lawson's van to the party. When they arrived, the three men parked directly in front of the house. For a while, Howard, Willis, and Lawson socialized with several others in the house's front yard. Some of the partygoers sat on the front porch while others stood in the yard or sat in the van.

A neighboring house was also hosting a party. At some point, Lawson, Howard, and McBride went to the party next door. They stayed for only a short while before returning to McBride's yard. Howard testified that they did not encounter any problems at the neighboring house. A few minutes later, Lawson and McBride went back over to the neighboring party. This time, McBride returned almost immediately but Lawson stayed for several minutes. He ultimately returned to McBride's house without incident.

Within a few minutes of Lawson's return, a Hispanic or Latino man wearing a bandana approached from the direction of the neighboring house. The man immediately confronted Lawson, made a gesture with his hands that Howard and Willis interpreted to be a gang sign, and said either "Latin King" or "Almighty Latin King." *Compare* Trial Tr. pt. 2, dkt. no. 10-19, at 18, *with id.* at 104. Lawson apparently told the man to get away from him. According to Howard and Willis, a heated argument ensued, though there was no physical altercation. After several minutes, the man in the bandana stormed away, warning the group that he would be back and, according to Howard, that they should not be there when he returned.

The group began collecting their things and piling into Lawson's van to leave. But before they could, the man in the bandana returned, this time with another Hispanic or Latino man. The second man wore a red shirt and, according to Howard and Willis, asked the man in the bandana, "Which one?" *See id.* at 26, 113. Another argument between Lawson and the two men ensued. According to Willis and Howard, Lawson eventually attempted to disengage by walking away from the altercation.

When Lawson began to walk away, Howard and Willis testified, the man in the red shirt drew a revolver and fired one shot toward Lawson. Lawson continued walking for a moment before collapsing. The shooter fled. Willis and Howard stayed with Lawson until paramedics arrived, then followed the ambulance to Christ Hospital. Lawson was later pronounced dead as a result of injuries sustained from the gunshot.

About two weeks later, on July 25, a police detective presented Howard with a photo array of six individuals. Howard identified Ortega as the shooter. On August 5, Howard was presented with an in-person lineup, this time including four men. Of the four, he again identified Ortega as the shooter. On August 7, Willis, who was in custody on an unrelated traffic violation, was also presented with an array of six photos. From the six photos on the page, he too identified Ortega as the shooter. Both men testified that they had spoken to no one about these identifications ahead of time.

Ortega was arrested and charged with Lawson's murder. His trial occurred in November 2004. The prosecution called Howard and Willis, who testified that they saw Ortega fire the gunshot that killed Lawson. Ortega's attorney, Michael Johnson, argued mistaken identity. Although Ortega testified that he could not remember where he was on the night of Lawson's murder, Johnson argued that Howard and Willis had to be

mistaken. On cross-examination, Johnson elicited testimony from Willis and Howard that they had each drank some alcohol the night of the shooting and confronted them with somewhat inconsistent descriptions about the shooter's clothes and physique that they had given during the initial investigation.

Ultimately, after a three-day trial, the jury convicted Ortega of murder. Ortega appealed, arguing that there was insufficient evidence to convict him, that he had received ineffective assistance of counsel, and that his constitutional rights have been violated when prosecutors made certain prejudicial remarks about his character for dishonesty during closing arguments. The Illinois appellate court affirmed the conviction, rejecting Ortega's first two arguments and holding that the third had been forfeited when Ortega's attorney failed to object at trial. *See* Ex. A to State Court Record, *People v. Ortega*, 369 Ill. App. 3d 1048, 932 N.E.2d 1038 (table), dkt. no. 10-1, at 11. The Illinois Supreme Court denied Ortega's petition for leave to appeal, which was based on the same three grounds. *See* Ex. H to State Court Record, *People v. Ortega*, 225 Ill. 2d 662, 875 N.E.2d 1120 (table) (2007), dkt. no. 10-8.

Ortega then filed a pro se postconviction petition in Illinois state court. He again alleged that his trial counsel, Johnson, had been ineffective for failing to investigate and present an alibi defense. Specifically, Ortega claimed that he had told Johnson that his mother and sister, Louise and Leticia Ortega, would have testified that he was at Louise's home at the time of the murder, but that Johnson dismissed their testimony as insufficiently credible without other corroborating evidence. Ortega presented affidavits from Louise and Leticia supporting his argument and asserting that Johnson had never interviewed them. These affidavits also mentioned at least one other potential witness:

Louise's then-boyfriend Benny, who was present at Louise's home until about 12:30 a.m. on the night of Lawson's murder.

The circuit court dismissed Ortega's petition at the first stage of postconviction proceedings because it found the petition to be patently without merit. *See* Ex. B to State Court Record, *People v. Ortega*, 399 Ill App. 3d 1222, 990 N.E.2d 931 (table) (2010), dkt. no. 10-2, at 1, 4; *see also* 725 ILCS 5/122-2.1 (describing first-stage review). Ortega appealed with the help of appointed counsel, and the Illinois appellate court reversed, concluding that Ortega's postconviction petition "did not lack an arguable basis in either law or fact." *Id.* at 7. It remanded to the circuit court to continue to the second stage of Illinois postconviction review. *Id.* at 8.

Appointed counsel filed a supplemental postconviction petition on Ortega's behalf focused on the ineffective assistance of counsel claims. This supplemental petition included new affidavits from Louise and Leticia Ortega. Ortega's mother, Louise, stated this time that she had in fact spoken to Ortega's trial counsel, Johnson, on the first day of Ortega's trial about testifying about Ortega's alibi. But she said that Johnson advised her that her testimony would not be believable to a jury without some sort of corroborating evidence that Ortega had been at her home on the night of Lawson's murder.

The state again moved to dismiss Ortega's petition. The circuit court granted the petition, finding that Ortega had failed to make a substantial showing that his constitutional rights were violated. Ortega appealed. This time the Illinois appellate court affirmed, finding that Johnson's actions had not amounted to ineffective assistance of counsel. *See People v. Ortega*, 2017 IL App (1st) 151326-U, at ¶¶ 1-2, 19-23.

Specifically, it reasoned that the record "shows trial counsel was aware of the potential alibi testimony and decided not to call defendant's mother and sister as witnesses in light of defendant's testimony that he could not recall his whereabouts on the night the offense occurred." *Id.* ¶ 21. On this record, it concluded that Ortega had shown neither that Johnson was objectively deficient nor that any such deficiency had resulted in prejudice, as required by *Strickland v. Washington*, 466 U.S. 668 (1984). *See Ortega*, 2017 IL App (1st) 151326-U, at ¶ 19-26.

On May 22, 2018, Ortega filed this timely petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**Discussion**

The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this Court's review. As the Seventh Circuit recently articulated:

> Habeas relief cannot be granted for persons in custody pursuant to a judgment of a state court unless the adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Czech v. Melvin*, 904 F.3d 570, 573 (7th Cir. 2018) (quoting 28 U.S.C. § 2254(d)). "A federal court may issue a writ of habeas corpus under the 'contrary to' clause of AEDPA if the state court applied a rule different from law set forth in Supreme Court precedent, or if it decides a materially indistinguishable case differently than the Supreme Court." *Sims v. Hyatte*, 914 F.3d 1078, 1087 (7th Cir. 2019). "A state court decision is an 'unreasonable application' if it correctly identifies the governing legal rule, but applies it unreasonably." *Id.*

In short, to obtain relief under section 2254(d), "a state prisoner must show that

the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This is a notably deferential standard. *See id.* at 101.

Ortega contends that his constitutional rights were violated because (1) his conviction was supported by insufficient evidence; (2) his trial counsel was ineffective for failing to call an expert witness on the topic of eyewitness identification; (3) his trial counsel was ineffective for failing to investigate or call his mother and sister as alibi witnesses; and (4) the prosecution's closing argument violated due process.

**A. Insufficient evidence**

First, Ortega claims that there was insufficient evidence to support the jury's conclusion that he was the man who shot Lawson. To prevail under *Jackson v. Virginia*, 443 U.S. 307 (1979), Ortega must demonstrate that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The Illinois appellate court addressed this argument only in passing in its opinion affirming dismissal of Ortega's state postconviction petition, but this Court must nevertheless "determine what arguments or theories supported or, as here, could have supported, the state court's decision." *Harrington*, 562 U.S. at 102. Once it has surmised the appellate court's logic, the Court must then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court.]" *Id.*

The Court concludes that the Illinois appellate court did not apply *Jackson* unreasonably within that word's narrow meaning under AEDPA. At trial, the prosecution

presented two eyewitnesses who identified Ortega as the shooter. Willis and Howard were both present at the party on Houston Avenue on the night of the shooting. Both men testified that the street was well lit with street lights, porch lights, and the headlights of cars. They were with Lawson during and after the confrontation with the unnamed man in a bandana and both witnessed the man's short departure and subsequent return with the shooter. Likewise, both Willis and Howard testified that they saw the shooter draw a revolver and shoot Lawson once. Both witnesses identified Ortega as the shooter based on photo arrays—and, in the case of Howard, an in-person lineup. And, finally, both Willis and Howard identified Ortega as the shooter at trial.

When assessing whether a reasonable jury could have convicted under *Jackson* in the first instance, a court must assume that that jury drew all inferences and resolved all factual disputes in the prosecution's favor. *Branion v. Gramly*, 855 F.2d 1256, 1266 (7th Cir. 1988). Where, as here, a federal court is reviewing a state court's application of *Jackson* through section 2254(d)'s deferential lens, the petitioner's burden is even heavier. Because the Illinois appellate court did not unreasonably apply *Jackson* within the meaning of section 2254(d) when it implicitly rejected Ortega's insufficient-evidence argument, Ortega has not carried that heavy burden.

**B. Ineffective assistance of counsel**

Next, Ortega alleges that his trial counsel, Johnson, was constitutionally deficient in two ways. First, he contends that Johnson failed to call an expert witness who could testify about the unreliability of eye-witness testimony like that offered by Howard and Willis. Next, Ortega contends that Johnson failed to investigate or call his mother and sister as alibi witnesses.

"The Sixth Amendment's right to the effective assistance of counsel provides . . . relief when counsel's performance was objectively deficient." *Swanson v. United States*, 692 F.3d 708, 714 (7th Cir. 2012) (internal quotation marks omitted). "To succeed on such a claim, [a petitioner] must show both that his attorney's performance was objectively deficient—in other words, that it fell outside the wide range of competent representation—and that he was prejudiced by the subpar representation." *United States v. Jones*, 635 F.3d 909, 915 (7th Cir. 2011); *see also Strickland*, 466 U.S. at 687-96. There is a presumption that counsel's conduct falls within the range of reasonable professional assistance. *Swanson*, 692 F.3d at 714.

In limited circumstances, counsel's conduct can give rise to a per se violation of the Sixth Amendment right to counsel. This occurs when counsel is not present at all or at critical stages; fails completely to cross-examine or subject the opposing case to the adversarial process; has an actual conflict of interest; or fails to file a requested appeal. *See Cole v. United States*, 162 F.3d 957, 958 (7th Cir. 1998) (citing *United States v. Cronic*, 466 U.S. 648, 658–61 (1984)). Because Ortega only offers a conclusory allegation that his counsel was per se ineffective, he must demonstrate that Johnson's performance was objectively deficient and that the deficiency prejudiced him. *See Jones*, 635 F.3d at 915. To demonstrate "prejudice," Ortega "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Ortega's claim is held to a yet more demanding standard because it does not present an ineffective assistance of counsel claim in the first instance but rather on

habeas review of a state court's determination. "The standards created by *Strickland* and [section] 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal quotation marks omitted). Therefore, the determinative "question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Id.*

**1. Failure to call an eye-witness testimony expert**

Ortega first argues that Johnson's failure to call an expert witness on the unreliability of eye-witness testimony amounted to ineffective assistance of counsel. The Illinois appellate court did not grapple with this argument. A trial attorney's decision to call—or to forego—an expert witness is, as with any other witness, typically a matter of strategy. In *Harrington*, for instance, the Supreme Court concluded that defense counsel's decision to forego use of an expert in blood evidence "was at least arguabl[y]" reasonable, even though blood evidence was key to the prosecution's case. *See Harrington*, 562 U.S. at 106-07. The Court explained that:

> From the perspective of Richter's defense counsel when he was preparing Richter's defense, there were any number of hypothetical experts—specialists in psychiatry, psychology, ballistics, fingerprints, tire treads, physiology, or numerous other disciplines and subdisciplines—whose insight might possibly have been useful. An attorney can avoid activities that appear distractive from more important duties. Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.

*Id.* at 107 (internal quotation marks omitted). Where a petitioner seeks to demonstrate ineffective assistance of counsel based on the failure to call an expert witness, he must therefore make a "specific, affirmative showing as to what the missing evidence or testimony would have been." *United States ex rel. McCall v. O'Grady*, 908 F.2d 170,

173 (7th Cir. 1990).

Here, as in *Harrington* and *McCall*, the appellate court reasonably concluded that Johnson's failure to call an expert witness on eye-witness testimony was not objectively deficient. Ortega has not shown what such an expert witness would have testified or that Johnson's failure to call one was so clearly constitutionally deficient as to overcome the presumption of competence and the high bar of section 2254(d).

**2. Failure to investigate alibi witnesses**

Ortega's next argument concerns his trial attorney's failure to investigate alibi witnesses. Ortega's mother and sister, Louise and Leticia Ortega, offered affidavits to accompany his initial postconviction petition that stated that he was at Louise's home with them on the night of Lawson's shooting. In these affidavits, Louise and Leticia asserted that attorney Johnson declined to speak to them about their testimony before trial. In a subsequent affidavit, Louise reiterated that she had never been interviewed by Johnson (either before or during the trial) but stated that she had spoken to him on the first day of Ortega's trial. She testified that on the morning of jury selection she had confronted Johnson about testifying and that he had told her that he would not call her as a witness unless she had documentary evidence to corroborate her account. *See* Ex. V, dkt. no. 10-22, at 9. Leticia's supplemental affidavit was similar, except that she says that Johnson never spoke to her. *See id.* at 11. Rather, she says she learned from Ortega himself that Johnson had decided not to call her because he believed she would not be credible due to her relationship with Ortega.

Applying *Strickland*, the Illinois appellate court concluded that Johnson's decision not to call Louise and Leticia was strategic and did not rise to the level of objective

deficiency. In view of Louise's subsequent affidavit and Johnson's arguments at trial, the court reasoned that Johnson was aware of Louise and Leticia Ortega's potential alibi testimony but opted instead to rely on arguments about Ortega's candor and credibility. *See Ortega*, 2017 IL App (1st) 151326-U, ¶¶ 20-21. Specifically, Johnson argued to the jury that Ortega's admission that he could not remember where he was on the night of the murder supported the conclusion that his testimony about his innocence was honest because he refused to fabricate fake alibi witnesses. *Id.* ¶ 21. The appellate court found that this strategic decision was not constitutionally deficient under *Strickland*'s first element.

Next, the appellate court held that, even if it were objectively deficient, Johnson's choice not to call Louise and Leticia Ortega did not sufficiently prejudice Ortega to entitle him to relief. *See id.* ¶ 22-23. It noted that, on direct appeal, the court had commented that the state had a "strong case" against Ortega, including two eyewitnesses who testified they had seen the shooter's face and both of whom had identified Ortega before and during trial. *Id.* ¶ 22. The appellate court stated that the proposed alibi testimony would have been afforded little weight and concluded that Ortega "has not demonstrated that the investigation and presentation of the alibi defense would have resulted in a different outcome at trial." *Id.* ¶ 23.

The Court concludes Ortega's claim may have merit and thus is inclined to appoint counsel. *See* 28 U.S.C. 2254(h) (providing for appointment of counsel). The Illinois appellate court's analysis of Ortega's alibi investigation claim under *Strickland* appears to have been lacking in two key ways. First, the court did not meaningfully address whether Ortega's counsel investigated the proposed alibi witnesses. Ortega

points to the affidavits from Louise and Leticia in which both contend that Johnson never interviewed them. Louise was only able to get Johnson to speak to her when she initiated a conversation with him on the day of the trial. Even then, Johnson allegedly waved her away and told her he had no reason to talk to her unless she had documentary evidence of Ortega's whereabouts on the night of Lawson's murder. The Illinois appellate court dealt with this argument in a single paragraph, citing an Illinois Supreme Court case for the proposition that counsel is not ineffective "for failing to call potential alibi witnesses where they were related to defendant and counsel reasonably could have concluded that their testimony was unreliable." *See Id.* ¶ 21 (citing *People v. Flores*, 128 Ill. 2d 66, 106-07, 538 N.E.2d 481, 497-98 (1989)).

Critically, however, the appellate court did not make a finding that Johnson had actually investigated the alibi witnesses or that his investigation (if any) was a reasonable basis on which to dismiss Louise and Leticia's testimony. Rather, the court reasoned that because Louise and Leticia's testimony was more confident than Ortega's about where he had been on the night of Lawson's murder—he said he could not recall his whereabouts—it was a strategic choice for Johnson not to call them as witnesses. But calling something a strategic decision does not relieve counsel of his duty to conduct a reasonable investigation or to make a reasonable decision, based on the circumstances of the case, that such an investigation is not necessary. *See Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation"); *see also Flores*, 127 Ill. 2d at 105, 538 N.E.2d at 497 (suggesting that, if "failure to call the witnesses was the result of failure to investigate,

neglect, or incompetence," it would violate *Strickland*).

The Seventh Circuit has recently addressed this issue in the AEDPA context. In *Stitts v. Wilson*, 713 F.3d 887 (7th Cir. 2013), the court reasoned:

> The state court decision as well as the State's brief repeatedly emphasizes that an attorney's decision not to raise an alibi defense is generally considered a strategic decision entitled to substantial deference, a fundamental proposition we do not dispute. However, the main issue in this case is whether trial counsel's *investigation* of a potential alibi defense was sufficient under any reasonable application of *Strickland*. After all, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." If trial counsel's investigation of a potential alibi defense was unreasonably limited, then trial counsel's decision not to present an alibi defense is too ill-informed to be considered reasonable.

*Stitts*, 713 F.3d at 891-92 (quoting *Strickland*, 466 U.S. at 690-91) (some internal quotation marks and citations omitted). The Court of Appeals concluded in *Stitts* that the state court had applied *Strickland* unreasonably when it treated the question of whether counsel had conducted a reasonable investigation of a potential alibi witness as a dichotomous one. That is, the state court's choice to dispose of the issue by simply noting that the petitioner had "failed to show that trial counsel did not investigate his claimed alibi defense" was unreasonably perfunctory. *Id* at 892.

And *Stitts* is not alone in finding the sort of reasoning employed by the Illinois appellate court to be problematic. In *Brady v. Pfister*, 711 F.3d 818 (7th Cir. 2013), for instance, the Seventh Circuit described categorical dismissal of alibi testimony from family members as "deeply problematic" and stated that "the law does not demand, or even permit, the disregarding of their testimony just because they are close to the accused." *Id.* at 824. Likewise, in *Blackmon v. Williams*, 823 F.3d 1088 (7th Cir. 2016), the court noted that "the decision not to call a particular witness is frequently strategic,

insulated from attack on ineffective-assistance grounds," but held that "an outright failure to investigate witnesses . . . is more likely to be a sign of deficient performance." *Id.* at 1104 (internal quotation marks omitted).

*Raygoza v. Hulick*, 474 F.3d 958, 963-64 (7th Cir. 2007), offers yet more support for Ortega's perspective. There, a defense attorney opted not to interview a defendant's mother who offered alibi testimony about a party she said she had attended with the defendant. "As an abstract matter," the court wrote, "[the trial attorney] was surely correct to think that it is hard to win on an alibi defense." *Id.* at 963. "He may also have been correct to conclude that a defendant is in a weak spot if the only alibi witness he can offer is his mother, or perhaps just a mother and a girlfriend." *Id.* But such general assessments are not sufficient, the court concluded, because speaking with the defendant's mother could have changed the character of the defendant's case.

> Had [the attorney] gleaned the information from Maria about the evening party that was easily available for the asking, he would have learned that this was not a case where only the mother was willing to vouch for a defendant's alibi. To the contrary, witnesses both related and unrelated to Raygoza could have been called. A consistent story from all of them would have forced the trier of fact to confront the possibility that Raygoza had been mistaken for another young Hispanic male with a blond ponytail.

*Id.* Here, like in *Raygoza*, an investigation of Louise and Leticia's alibi testimony may have revealed evidence that changed the nature of Ortega's defense. For one, such an investigation conceivably might have revealed that a third witness with no direct family relation to Ortega was present in Louise's home on the night of Lawson's murder: Louise's then-boyfriend Benny.

Contrary to the state's position, *United States ex rel. Simmons v. Gramley*, 914 F.2d 1128 (7th Cir. 1990), does not compel denial. It is true that *Gramley* involved an

ineffective assistance of counsel claim based on a failure to investigate a defense. *Id.* at 1134-35. And, as here, the state argued that counsel's decision not to investigate an alibi was a strategic one and thus insulated from review. *Id.* But *Gramley* is different from this case in two ways. First, it involved only "cursory allegations" that counsel failed to pursue a defense. *Id.* at 1134. The petitioner did not include the sort of "sufficiently precise information" required to make out a claim for inadequate investigation. *Id.* at 1133. In contrast, this Court knows (as did the Illinois appellate court) the details of the defense that Ortega says his counsel failed to investigate. Second, and perhaps more importantly, *Gramley* involved a proposed defense that was directly contradictory to the defendant's trial testimony. "Certainly, once Simmons testified to one cause for the accidental firing of his pistol," the Seventh Circuit wrote, "he cannot now fault his attorney's decision not to pursue a different alibi defense." *Id.* at 1135. Here, of course, Ortega did not testify to facts that contradicted the accounts of Louise and Leticia. Rather, he testified that he could not remember where he was on the night of Lawson's murder. That testimony is not in the least bit inconsistent with the proposed alibi witnesses' accounts, which is more than enough to distinguish this case from *Gramley*.

The Court also has reservations about the Illinois appellate court's analysis of *Strickland*'s prejudice requirement. To demonstrate "prejudice," Ortega "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. But instead of applying *Strickland*'s prejudice standard, the Illinois appellate court appears

to have relied on case law applying the sufficiency of the evidence standard from *Jackson*, 443 U.S. at 319, discussed above. Specifically, it cited *People v. Smith*, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 370 (1999), for the proposition that "[t]he testimony of a single witness, if it is positive and the witness credible, is sufficient to sustain a conviction." *Ortega*, 2017 IL App (1st) 151326-U, ¶ 22. True enough, as far as it goes, but the court's citation to the sufficiency of the evidence standard in place of *Strickland*'s prejudice requirement raises doubts about the reasonableness of its application of controlling law.

The Court is therefore persuaded that this piece of Ortega's ineffective assistance of counsel claim should not be denied outright. Instead, the Court will appoint counsel under 28 U.S.C. § 2254(h) to explore the viability of Ortega's claim, as well as whether an evidentiary hearing should be held. *See* 28 U.S.C. § 2254(e)(2); *Lee v. Kink*, 922 F.3d 772, 773-75 (7th Cir. 2019).

**C. Closing argument**

Finally, Ortega also argues in general terms that the prosecution's closing arguments at trial—which included statements that Ortega was a "liar" and a "thinking criminal"—violated his due process rights. The Illinois appellate court did not reach this question on collateral review but rejected the argument as forfeited in its opinion affirming Ortega's conviction on direct appeal. *See* Ex. A to State Court Record, *People v. Ortega*, 369 Ill. App. 3d 1048, 932 N.E.2d 1038 (table), dkt. no. 10-1, at 11. Specifically, it held that because defense counsel did not object to these statements at the time they were made, the argument was forfeited. *Id.*

The state court's holding that this argument was defaulted as a matter of state

procedural rules bars this Court from considering the argument unless Ortega "can demonstrate the cause for the default and actual prejudice as a result of the alleged violation of federal law" or that he is actually innocent. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Beyond his ineffective-assistance arguments, discussed above, Ortega has made no attempt to show cause or prejudice that would permit this Court to look past the procedural default. Even if he had, it is unclear from the face of Ortega's petition and the record as a whole what precisely his constitutional complaint about the prosecution's closing argument is. He asserts that the prosecutors' statements prejudiced him, but he cites no authority for the proposition that impugning a testifying defendant's character for honesty without more is unconstitutional. To the contrary, the Seventh Circuit has held that "[a] comment on the defendant's credibility that is supported by the evidence is a hard blow, but a fair one. Where the character and credibility of the defendant are at issue and the evidence allows the inference that the defendant has been less than truthful, the prosecutor does not err in closing argument by referring to the defendant as a liar." *United States v. Turner*, 651 F.3d 743, 752 (7th Cir. 2011).

**Conclusion**

For the foregoing reasons, the Court denies Ortega's petition for a writ of habeas corpus, with the exception of his ineffective assistance of counsel claim based on his trial attorney's failure to investigate alibi witnesses [dkt. no. 1]. By separate order, the Court will appoint counsel to pursue that claim. *See* 28 U.S.C. § 2254(h).

MATTHEW F. KENNELLY
United States District Judge

Date: August 9, 2019